MITCHELL *et al.,* commissioners, *v.* LASSETER *et al.*

| 114 275 |
| Case 2 |
| 114 885 |

| 114 275 |
| Case 2 |
| 123 864 |

| 114 275 |
| Case 2 |
| e125 293 |

1. An act of the General Assembly authorizing the county authorities of a given
county "to select and locate some central and convenient place within the
same for a county-site" did not require that the place so selected should be
at or near the geographical center of the county, unless at the time the county-
site was selected such a place would be convenient to the people of the
county.  The selection of a place near the center of one side of the county
which was most easily accessible to a majority of the people of the county was
a substantial compliance with the act.

2. When, under authority of an act of the character above referred to, the offi-
cers in charge of the affairs of a county acquire land at such a place as is
above indicated, and erect thereon permanent and substantial buildings, such
as a court-house and jail, and the same are used for more than twenty years
as the court-house and jail of the county, and the place so selected has been,
for the space of time mentioned, recognized by the people and officers of the
county, as well as by every department of the State government, as the county-
site, it will be presumed, when the records of the county authorities have been
lost or destroyed, that the county-site was permanently located at the place
referred to, in the manner provided in the act.  Especially would such pre-
sumption arise when a witness testifies that he was present at a meeting of
the county authorities when an order to this effect was passed by them.

3. Recitals of fact in a public statute are not conclusive upon the courts, but
evidence may be introduced to disprove them.

4. A court of equity will, at the instance of citizens and taxpayers of a county, enjoin the authorities in charge of the affairs of such county from carrying into effect an unauthorized order or judgment providing for the location of a county-site, in the execution of which order it will be necessary either to expend the money of the taxpayers in the treasury of the county, or to incur illegal indebtedness by the county.

Argued November 20, — Decided December 10, 1901.

Injunction. Before Judge Roberts. Wilcox superior court. August 29, 1901.

*Max E. Land* and *J. H. Martin*, for plaintiffs in error.
*Eldridge Cutts* and *J. L. Bankston*, contra.

COBB, J. This was an application by certain residents and taxpayers of Wilcox county, to enjoin the board of county commissioners of that county from removing the county records from Abbeville to Rochelle and establishing the latter place as the county-site of the county. The judge granted the injunction prayed for, and to this the defendants excepted.

1. The plaintiffs contend that the county-site of Wilcox county has been located according to law at Abbeville, and that, having been so located, the county commissioners have no authority to remove it to another point except in the manner provided in the constitution. The defendants contend that the county-site has never been permanently located at any place, and that they are not seeking to *remove* the county-site from Abbeville to Rochelle, but are simply proceeding to locate the county-site at the latter place pursuant to certain acts of the General Assembly. Whether the action on the part of the board of commissioners is a mere location of the county-site, or amounts to a removal thereof, depends upon the determination of the question whether the county-site has been heretofore permanently located at Abbeville under the provisions of the act of 1857, which provided for the laying out and organization of Wilcox county. See Acts of 1857, p. 46. The 3d section of the act just referred to provided: "The inferior court of said new county shall select and locate some central and convenient place within the same for a county-site, provide for the erection of the public buildings, laying off the site into lots and streets, and make all such temporary arrangements for the transaction of the public business of said new county, in the meantime, as may be necessary and proper." Under the provisions of this section the

inferior court were authorized to select some place within the
county for the county-site, but in the selection of this place they
were required by the section to have due regard to two things:
first, the place selected must be central; and, second, the place
selected must be convenient.　In determining the question as to
where the county-site was to be located, the inferior court had
a discretion vested in them by the provisions of this act, but this
discretion was to be exercised in such a way as to locate the
county-site at that place which would be most convenient to the
people of the county, and at the same time at a point which would
be considered central under existing conditions.　The county-site
was to be as near central as possible, taking into consideration the
location of the population of the county at the time the county-site
was located.　It appears from the evidence in the present case
that, at the date of the passage of the act of 1857, nearly the en-
tire population of Wilcox county resided along the Ocmulgee river
on the eastern boundary of the county, and that the middle and
western portions of the county were very thinly settled.　The place
now known as Abbeville was located on the Ocmulgee river about
midway of the eastern boundary of the county.　Taking everything
into consideration, this place was beyond question the most con-
venient place for the county-site at that time, so far as the popu-
lation of the county was concerned, and it was to this extent a cen-
tral point in the county.　It was undoubtedly the intention of the
General Assembly, when they confided to the inferior court the au-
thority to locate the county-site at some central and convenient
place, that this power should be so exercised as to locate the county-
site at a point which would be most easily accessible to the popu-
lation of the county as it existed at the date of the passage of the
act.　It certainly could not have been the intention of the General
Assembly that the inferior court should locate the county-site at or
near the geographical center of the county; and this for two rea-
sons: first, if the act is so construed, then the word "convenient"
has no meaning whatever; and, second, if this word be given its
full signification, which must be done, then at the date of the pas-
sage of the act the geographical center of the county would not
have been a convenient place so far as the population of the county
was concerned.

　　2. Treating it as established that the place designated as Abbe-

ville was a central and convenient point within the meaning of the act at the date of its passage, the question to be determined is, did the inferior court under the act permanently locate the county-site at Abbeville? It appears from the evidence that temporary arrangements were made by the inferior court under which the public business of the county was transacted in a double-pen log-house; that they acquired title to fifty acres of land for county purposes, under a donation made to them by a citizen of the county; that they proceeded to lay off the land so acquired into lots and streets, reserving five acres for the location of a court-house and jail; that in 1858 they proceeded to construct a substantial court-house, which was at that time amply sufficient for all the needs of the county and its officers. They also erected a substantial jail upon the land reserved for that purpose, which was also sufficient for all the needs of the county. The court-house thus built was used for twenty years, when it was burned, and a new substantial court-house was erected in its place, which was all that was requisite for the needs of the county at the time of its erection, and this latter court-house is now in use. From the time that the first court-house and jail were erected in Abbeville in 1858 to the present time, Abbeville, so far as the public business of the county is concerned, has been treated, not only by the people of that county, but by every citizen and public officer in the State who had to transact any public business in connection with the affairs of Wilcox county, as the county-site of the county. For more than forty years the people and county officers have treated Abbeville as the county-site; and it has been recognized as such by every department of government in the State — legislative, judicial, and executive. It does seem that this state of affairs alone would be sufficient at this late day to raise a conclusive presumption that the inferior court had formally and properly entered a judgment upon its minutes permanently locating the county-site of Wilcox county at Abbeville. The records of the inferior court of that date are, according to the evidence, not to be found, but there is a witness who testifies that he was present at a meeting of the inferior court when an order was passed permanently locating the county-site at Abbeville. The facts above referred to, in connection with the testimony of this witness, we deem amply sufficient to authorize the judge to find, as he did, that the county-site had been by the inferior court located at the town of Abbeville.

3. It is contended, however, that the General Assembly recognized, by the passage of an act in 1879 (Acts 1878–9, p. 409), that everything that had been done for twenty years past in regard to the transaction of public business and the construction of the public buildings in Wilcox county was a mere temporary arrangement, and that nothing permanent was intended. This act of the General Assembly is as follows:

"An act to carry out the true meaning and intent of the third section of an act, approved December 22, 1857, entitled 'an act to lay out and organize the county of Wilcox, and to declare the duties of the county authorities, and the rights of the citizens of said county,' relative to locating the county-site of Wilcox county, and for other purposes.

"Section I. Be it enacted by the General Assembly of Georgia; that the county authorities of Wilcox county shall locate the site of Wilcox county at some central and convenient place in said county, as is prescribed in the third section of the act of the 22d day of December, 1857, that created the county of Wilcox, and that the court-house shall be erected at the site selected by the county authorities.

"Sec. II. Be it enacted by the authority aforesaid, that any tax-payer of the county of Wilcox may apply to the chancellor to restrain the location of the county-site, and the erection of the court-house, at any place other than some central and convenient place in said county, and the question as to whether the selection is made in accordance with the true intent and meaning of the third section of the aforesaid act shall be tried by a jury, as other equity causes are tried.

"Sec. III. Repeals conflicting laws."

If the county site of Wilcox county had been permanently located by the inferior court at Abbeville prior to the passage of the act just quoted, then the act was inoperative for the reason that in no view could it be construed as an act to authorize the removal of a county-site, but it was one simply authorizing the location of a county-site; the act being evidently passed on the assumption that the county-site of Wilcox county had not been permanently located. But if the act could be treated as one authorizing the removal of the county-site, then the act would be unconstitutional, because the General Assembly had no power to authorize the removal of the

county-site in any other manner than that provided for in the constitution. The act, however, authorizing simply the location of a county-site, and the recitals in the act clearly indicating that the General Assembly was of the opinion that no county-site had been located permanently in Wilcox county under the provisions of the act of 1857, the question arises, what effect is to be given the recitals of fact in the act of 1879, upon which the subsequent provisions of the act were based ? These recitals are in the nature of a preamble, though not strictly in that form. They are really to be regarded, not as a part of the law which was enacted, but simply as the reasons which influenced the General Assembly to pass the law. So treating them, are these recitals of fact to be conclusive upon the courts when they come to investigate the question whether the county-site had been actually and permanently located pursuant to the provisions of the act of 1857 ? We do not think so, but we are of opinion that, when a proper case is made, the courts may go behind the act and ascertain whether the recitals of fact contained therein are in fact true. In this connection we quote the following pertinent and forceful language from the opinion of Judge Nisbet in *Dougherty* v. *Bethune,* 7 *Ga.* 90, 92 : " The legislature has no power to legislate the truth of facts. Whether facts upon which rights depend are true or false is an inquiry for the courts to make under legal forms; it belongs to the judicial department of the government. By the constitution the legislative and judicial departments are distinct. A citizen is not estopped to deny in the courts of the country any mere fact which the legislature may choose to recite. If he was, the government would be a despotism, and the legislature might be a tyrant." See also, in this connection, *Thornton* v. *Lane,* 11 *Ga.* 459, 520; *Lane* v. *Harris,* 16 *Ga.* 217, 222 ; Elmondorff *v.* Carmichael, 3 Litt. 472, s. c. 14 Am. Dec. 86, 93. It is true that in the cases cited the court was dealing with private statutes, but the reasoning upon which these decisions are based applies with as much force to public as to private statutes. The legislature has no power to bind the courts by recitals of facts in a public statute ; and, according to the authorities cited, such recitals in a purely private statute would not be binding on anybody except the person applying for the act. He would be estopped to deny them, because he applied for and accepted benefits from an act which was founded upon these recitals. In The King *v.* Greene,

6 Ad. & El. 549, it was held that the fact that a given place was mentioned as a "borough," in a public statute referred to in that case, and that the " boroughholders and freemen of the borough", are mentioned in connection with it as " the corporate body," is not conclusive of the place having been a borough, or the boroughholders and freemen having been a municipal corporation before the passage of the statute.　In The Queen v. Haughton, 1 El. & Bl. 501, it was held that a recital in an act, that a certain highway was in a named township, was not conclusive; it being said; in the opinion by Lord Chief Justice Campbell, that a mere recital in an act of Parliament, either of fact or law, is not conclusive; and the courts are at liberty to consider the fact or the law to be different from the statement in the recital.　See also End. Int. Stat. § 375; Sedg. Const. Stat. 44; Parmelee v. Thompson, 7 Hill, 77.

4. It is contended by the plaintiffs in error that the judge erred in granting the injunction, for the reason that the plaintiffs in the court below had no right to maintain their action, because the board of commissioners in locating the county-site under authority of the acts of 1857 and 1879 were engaged in the exercise of a legislative act, which could not be controlled by the courts.　Under the view we have taken of the case, this contention of the plaintiffs in error must fail, because the board of county commissioners had no authority to pass the order locating the county-site at Rochelle, and the order was absolutely null and void.　No act done thereunder would be binding upon the county.　As the board of commissioners were threatening to carry this order into effect, and in doing so would necessarily expend the money of the taxpayers, certainly the taxpayers of the county, or any one or more of them, had a right to appeal to a court of equity to prevent this unauthorized use of public money.　In addition to this, the county commissioners were preparing to enter into contracts, which, although invalid for want of power in them to make the same, would entail upon the county expense and loss in resisting the efforts of those who might claim under the contracts to enforce the same.　Any taxpayers of the county had a right to apply to a court of equity to prevent the county commissioners from making contracts which they had no authority to make.　See *Smith* v. *Magourich,* 44 *Ga.* 163; *Keen* v. *Waycross,* 101 *Ga.* 588; *Wells* v. *Ragsdale,* 102 *Ga.* 54 (7); *Mayor of Macon* v. *Hughes,* 110 *Ga.* 804.　The plaintiffs

in the court below had a perfect right to maintain their application for injunction; and under the facts as they appear in the record, the court did not err in granting the injunction.

.*Judgment affirmed. All the Justices concurring.*