S16A1011, S16X1012. WESTERN SKY FINANCIAL, LLC et al.
v. STATE OF GEORGIA; and vice versa.
(793 SE2d 357)

BENHAM, Justice.

These cases involve the scope of the State's authority to regulate so-called "payday loans" pursuant to OCGA § 16-17-1 et seq., which has come to be known as the Payday Lending Act. Pursuant to OCGA § 16-17-4 (b), the State of Georgia, acting through the Attorney General ("State") filed a complaint in Fulton County Superior Court alleging that CashCall, Inc. ("CashCall"), Delbert Services Corporation ("Delbert Services"), Western Sky Financial, LLC ("Western Sky"), and Martin A. Webb (collectively "Defendants") have violated OCGA § 16-17-2 (a) by engaging in a small-dollar lending enterprise

that collects illegal usurious interest from Georgia borrowers. Defendants operate outside the State of Georgia and their dealings with Georgia borrowers occurred telephonically or over the Internet, and when a loan is funded, the funds are transferred to the borrower via electronic transfer to the borrower's bank account. The State seeks civil penalties and injunctive and other equitable relief.

Initially, the trial court entered a temporary restraining order prohibiting Defendants from making loans in violation of the Act and from servicing such loans or collecting payments from borrowers. Defendants asserted that prohibiting them from servicing existing loans was beyond the purview of the Act. At a hearing addressing Defendants' motion to dissolve or modify the temporary restraining order, the court engaged in a discussion with the parties regarding a compromise that would permit the servicing and collection of already existing loans to continue but would require Defendants to place into escrow an amount estimated to be the funds Defendants expected to collect from Georgia borrowers during the pendency of the litigation. At that hearing, a representative of Defendants stated to the judge that Defendants expected to make a "few hundred-thousand-dollars" per month during the pendency of the litigation. Accordingly, the trial court entered an interlocutory injunction prohibiting Defendants from making new loans or assigning existing loans to any third party, but not prohibiting them from servicing existing loans. The State and CashCall then entered into a joint agreement and consent order whereby CashCall was required to deposit $200,000 into an escrow account and provide quarterly summaries of all payments collected from Georgia borrowers until the claim was resolved. The order expressly contemplated a future motion to modify the amount of the escrow deposit.

Shortly thereafter, Defendants filed motions to compel arbitration and to dismiss the action. The trial court referred the case to a special master who recommended the case be dismissed, but the trial court rejected the special master's recommendation and denied Defendants' motion to dismiss, finding that the State's claim was not barred by the language of OCGA § 16-17-1 (d) indicating that "[p]ayday lending . . . does not encompass loans that involve interstate commerce." Instead, the trial court found the State's claim against Defendants was proper under OCGA § 16-17-2 (a), which states: "It shall be unlawful for any person to engage in any business [which involves] . . . the making of loans of $3,000.00 or less" except under certain circumstances that do not apply in this case. The trial court also: (1) rejected Defendants' assertion that the claim is barred by operation of the Indian Commerce Clause because neither Mr. Webb nor Western Sky is entitled to tribal sovereign immunity simply

because Webb claims to be a member of the Cheyenne River Sioux Tribe ("CRST"); (2) rejected the assertion that the application of the Payday Lending Act to Defendants' conduct violates the Dormant Commerce Clause of the United States Constitution because the conduct does not occur wholly outside Georgia's borders; (3) rejected Defendant's assertion that the State's claims must be arbitrated pursuant to the terms of the loan agreements with Georgia borrowers that are subject to the action because the State is not a party to the underlying loan agreements; and (4) found the trial court has personal jurisdiction over defendant Webb.[1]

Upon learning through discovery that Defendants had actually collected millions of dollars from Georgia borrowers since the time the complaint was filed, the State filed a motion for modification of the injunction order and the consent order. After conducting a hearing, the trial court granted the State's motion to modify the interlocutory injunction, finding that the amount Defendants had collected from Georgia borrowers during the pendency of the litigation to the date of the order to be approximately $15,279,872.95.[2] Because the trial court found a substantial likelihood that the State will prevail on the merits of the claim at trial, and found a substantial threat exists that the State will suffer irreparable injury in that there might not be sufficient funds available to satisfy a judgment should the State prevail at trial, the trial court ordered Defendants to deposit the $15 million sum into the court's registry and to make quarterly deposits of any additional amounts that may be collected from Georgia borrowers in the future. The trial court, however, agreed to stay the granted relief during an appeal, upon the Defendants' deposit of an additional $1 million into the escrow account created following entry of the consent order requiring the deposit of $200,000. In a separate order, the trial court denied the State's motion to add as defendants J. Paul Reddam and WS Funding, LLC ("WS Funding"). Defendants filed a notice of appeal, and the State filed a notice of cross-appeal, and each appeal was docketed by this Court. For the reasons set forth below, we affirm the order denying Defendants' motion to dismiss,

---

[1] Although Defendants secured a certificate of immediate review of the order denying arbitration and the motion to dismiss, this Court denied the application for interlocutory appeal. See *Western Sky Financial, LLC v. State of Ga.*, Case No. S15I1043 (order dated May 7, 2015).

[2] The State represented in support of its motion to modify the injunction order that numerous records produced by CashCall demonstrate that Defendants made over 18,000 loans of $3,000 or less to Georgia borrowers, that Georgia borrowers still owed approximately $6.5 million on those loans, and that over time these borrowers have paid in excess of $31.4 million in interest and in excess of $6.5 million in fees for the loans, although the trial court did not make findings with respect to these additional alleged facts.

affirm the modification of the injunction order, and reverse the order denying the State's motion to add defendants.

## Defendants' Appeal, Case No. S16A1011

1. (a) First, we address Defendants' argument that the loans at issue in this case involve interstate commerce[3] and are thus expressly excluded by the plain language of the Act: "Payday lending involves relatively small loans and does not encompass loans that involve interstate commerce." OCGA § 16-17-1 (d). We reject the notion that this phrase was meant to exclude loans that involve interstate commerce from the scope of the Act. If that were so, the Act would be virtually meaningless because it would prohibit nothing. Instead, we are persuaded that this language is simply a legislative finding of fact that is obviously factually inaccurate. In any event, it does not define the scope of the Act and is not determinative of whether Defendants are liable to the State for the civil penalties sought in the complaint.

Title 16 of the Georgia Code is the State's Criminal Code, and we note that, unlike some legislative chapters, the legislature did not give Chapter 17 of that Title a name.[4] Instead, Chapter 17, OCGA §§ 16-17-1 through 16-17-10, has come to be known as the "Payday Lending Act" simply as a convenient nickname, and that is how we refer to it here. Clearly, the Act applies not only to what is commonly referred to as payday lending,[5] but to any business that involves the lending of amounts of $3,000 or less unless the loan falls within the exceptions set forth in OCGA § 16-17-2 (a), none of which apply in this case. OCGA § 16-17-1 includes a number of legislative findings that, inter alia, explain the reasons the General Assembly enacted this chapter. For example, OCGA § 16-17-1 (b) notes that the General Assembly found this chapter to be necessary despite the fact that the type of lending prohibited by the chapter is prohibited elsewhere in the Code because, it found, these other laws did not provide sufficient deterrents to cause this illegal activity to cease. Subsection (d) of that section also contains several legislative findings: that payday lenders have attempted to skirt the laws of Georgia by use of forum selection

---

[3] Defendants are out-of-state persons or entities, and the record reflects they made loans to Georgia borrowers by use of the telephone, over the Internet, and by other electronic means across state lines. The State does not contest that these activities involved interstate commerce.

[4] See, for example, OCGA § 7-3-1 et seq., to which the General Assembly gave the title "Georgia Industrial Loan Act."

[5] " 'A payday loan is a loan of short duration, typically two weeks [coinciding with the borrower's next payday], at an astronomical interest rate. Payday loans are the current version of salary buying or wage buying.' " (Citation omitted.) *Clay v. Oxendine*, 285 Ga. App. 50, 51 (1) (645 SE2d 553) (2007).

clauses in loan documents; that the General Assembly has determined such practices to be unconscionable and that they should be prohibited; and that the relatively small loans that are involved in payday lending do not involve interstate commerce.

That this last language, relating to interstate commerce, is not intended to limit the scope of the chapter is expressly stated in subsection (e) of section 1 of the chapter, referring to the legislature's intent:

> Without limiting in any manner the scope of this chapter, the General Assembly declares that it is the general intent of this chapter to reiterate that in the State of Georgia the practice of engaging in activities commonly referred to as payday lending, deferred presentment services, or advance cash services and other similar activities are currently illegal and to strengthen the penalties for those engaging in such activities.

OCGA § 16-17-1 (e). The plain language of this subsection makes clear that the definition of "payday lending" is not intended to limit the scope of the chapter. Further, OCGA § 16-17-2 (a) specifically outlaws the making of loans prohibited by the Act by use of the "mail, electronic means, the Internet, or telephonic means . . . ." But the prohibited conduct involves interstate commerce whenever a lender utilizes these means to make an illegal loan to a Georgia borrower. See *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U. S. 232 (100 SCt 502, 62 LE2d 441) (1980) (interstate transfers of funds was a factor in determining that sufficient interstate commerce existed for the Sherman Act to apply to residential mortgage lending by the defendants).

Because of federal preemption rules limiting a state's authority to regulate federally chartered banks or banks chartered by other states, the Act exempts such banks (OCGA § 16-17-2 (a) (3)), but does not exempt out-of-state non-bank lenders, such as the lenders in this case. See *Glenn v. State*, 282 Ga. 27, 28 (1) (644 SE2d 826) (2007). If, as Defendants argue, the Act is limited only to transactions that do not involve interstate commerce, the Act would effectively prohibit nothing at all. Today, when even in-state financial transactions typically utilize web-based electronic systems, even in-state lending arguably involves or affects interstate commerce.[6] Hence, the inac-

---

[6] See *United States v. Marek*, 238 F3d 310 (5th Cir. 2001) (applying the federal murder-for-hire statute, finding even the intrastate mailing of funds via the USPS involves interstate commerce); *United States v. Corum*, 362 F3d 489, 493 (II) (A) (8th Cir. 2004) (construing 18 USC § 844 (e), making it a crime to use the telephone or other instrumentalities affecting interstate

curate factual finding that the prohibited conduct described in the Act does not apply to loans that involve interstate commerce does not limit the scope of the chapter.

Indeed, this Court has long held that the legislature lacks the power to legislate the truth of facts. See *TDGA, LLC v. CBIRA, LLC*, 298 Ga. 510, 513 (783 SE2d 107) (2016) and *Tanner v. Brasher*, 254 Ga. 41, 42-44 (1) (326 SE2d 218) (1985), both citing *Dougherty v. Bethune*, 7 Ga. 90, 92 (1849). The truth of facts upon which rights are based is an inquiry for the courts. *Dougherty*, id. Although *Dougherty* and its progeny addressed private rights, "the reasoning upon which these decisions are based applies with as much force to public as to private statutes. The legislature has no power to bind the courts by recitals of facts in a public statute . . . ." *Mitchell v. Lasseter*, 114 Ga. 280 (40 SE 287) (1901). We note that OCGA § 16-17-2 (c) (2) attempts to make an arbitration clause in a payday loan contract unenforceable if the contract is unconscionable. The State asserts that the General Assembly inserted the language concerning interstate commerce into the statute as a finding of fact, and not a definitional limitation of the prohibited conduct, in an attempt to save the anti-arbitration provision of the Payday Lending Act from federal preemption as a result of the effect of the Federal Arbitration Act ("FAA").[7] Whether or not the legislature's inclusion of the interstate commerce language in OCGA § 16-17-1 (d) was an attempt to skirt the preemptive effect of the FAA, we conclude the use of that language was not intended to define the limits of the Act, but was merely intended to be a finding of fact. As such this Court is not required to apply the phrase that payday lending "does not encompass loans that involve interstate commerce" as a limitation of the scope of the Act.

(b) According to Defendants, interpreting the Act to apply to loans involving interstate commerce requires a violation of the rules of statutory construction. Citing *Kennedy v. Carlton*,[8] Defendants argue such an interpretation ignores this Court's instruction that

---

commerce to threaten to kill or injure another, finding that even when used intrastate, telephones are instrumentalities of interstate commerce); *United States v. Baker*, 82 F3d 273, 275-276 (I) (8th Cir. 1996) (construing the Travel Act, finding the electronic transfer of funds even within the same state involves interstate commerce).

[7] The FAA, 9 USC § 1 et seq., applies to all contracts containing an arbitration clause that involve or affect interstate commerce. *American Gen. Financial Svcs. v. Jape*, 291 Ga. 637, 638 (1) (732 SE2d 746) (2012), citing *Perry v. Thomas*, 482 U. S. 483, 489 (107 SCt 2520, 96 LE2d 426) (1987). A state law rule prohibiting arbitration of a particular type of claim and which conflicts with the terms and coverage of the FAA is preempted and displaced by that Act. See *Marmet Health Care Center v. Brown*, 565 U. S. 530 (I) (132 SCt 1201, 182 LE2d 42) (2012).

[8] 294 Ga. 576, 578 (2) (757 SE2d 46) (2014).

when construing a statute, a court is to "avoid[ ] a statutory construction that will render some of the statutory language mere surplusage . . . ." But that case goes on to state that "in considering the appropriate construction, this Court must seek to effectuate the intent of the General Assembly." Id. "[T]he golden rule of statutory construction requires us to follow the literal language of the statute unless it produces contradiction, absurdity, or such an inconvenience as to [e]nsure that the legislature meant something else." (Citation and punctuation omitted.) *Judicial Council of Ga. v. Brown & Gallo, LLC*, 288 Ga. 294, 297 (702 SE2d 894) (2010). For the reasons set forth in Division 1 (a), we conclude that OCGA § 16-17-1 (d), including the statement that payday lending "does not encompass loans that involve interstate commerce," is merely a legislative finding of fact to which this Court is not bound. Given the clear and unambiguous scope of the Act as a whole, to interpret that phrase as a definitional limitation upon payday lending and thereby exempt loans that involve interstate commerce from the prohibitions of the Act would create such a contradiction and absurdity as to demonstrate that the legislature did not mean it to create such a limitation. See *Gazan v. Heery*, 183 Ga. 30, 39-40 (187 SE 371) (1936). The trial court did not err in denying the motion to dismiss on this ground.

(c) Regardless of whether the Act's prohibitions apply to interstate loans, Defendants assert additional reasons why Georgia law does not apply to this dispute. Defendants first argue that contract formation law requires a finding that Georgia law does not apply to the loans in this case. Citing *Gen. Tel. Co. of the Southeast v. Trimm*,[9] Defendants assert that Georgia courts look to where "the last act essential to the completion of the contract was done" when determining the place where the contract was made and therefore the law that applies to it. Arguing that the last act essential to the completion of the loans was performed on the CRST Reservation in South Dakota because that is where Western Sky employees made the final decision to fund the loans, Defendants claim the contracts involved in this case were formed there and Georgia law does not apply.[10] But Defendants

---

[9] 252 Ga. 95, 96 (311 SE2d 460) (1984).

[10] Defendants point to one federal court that, when examining the same Western Sky loan contract, concluded that the company's contracts with borrowers were formed on the Reservation (*FTC v. Payday Financial, LLC*, 935 FSupp.2d 926, 938 (D.S.D. 2013)), but they also acknowledge that other courts have concluded that because the borrowers did not engage in any activities inside the Reservation, tribal law does not apply. See, e.g., *Smith v. Western Sky Financial, LLC*, 168 FSupp.3d 778 (E.D. Pa. 2016) and *Jackson v. Payday Financial, LLC*, 764 F3d 765, 782 (7th Cir. 2014) (rejecting the argument that the forum selection clause in these loans, attempting to stipulate that the loans are subject to the exclusive laws and jurisdiction of the CRST, is unenforceable). See also *State ex rel. Cooper v. Western Sky Financial, LLC*, 2015

cite no authority for the proposition that contract formation principles can be used to abrogate a state's police powers. As the State points out, over a hundred years ago Justice Holmes rejected similar arguments in a case challenging the legality of contracts to divert water from New Jersey to New York, in contravention of New Jersey law: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Hudson County Water Co. v. McCarter*, 209 U. S. 349, 357 (28 SCt 529, 52 LE 828) (1908), implicitly overruled on other grounds by *Sporhase v. Nebraska*, 458 U. S. 941 (102 SCt 3456, 73 LE2d 1254) (1982) (finding that a similar state law created a burden upon commerce and violated the Commerce Clause).

Defendants also point to a choice-of-law clause in the loan agreements purporting to stipulate that tribal law controls these agreements. "The parties to a private contract who admittedly make loans to Georgia residents cannot, by virtue of a choice of law provision, exempt themselves from investigation for potential violations of Georgia's usury laws." *BankWest, Inc. v. Oxendine*, 266 Ga. App. 771, 775 (598 SE2d 343) (2004) (involving an investigation into payday lending practices). See also *State ex rel. Cooper v. Western Sky Financial, LLC*, 2015 WL 5091229 (Sup. Ct. of N. C., Wake County Business Ct., Aug. 27, 2015) (finding the state in an enforcement proceeding against these same defendants was not bound by a choice of law provision in the borrower contracts to which the state was not a party). Again, the police power to enforce the criminal laws of this State cannot be defeated by the efforts of parties to an agreement to contract around it. Moreover, a recent case in which the federal Consumer Financial Protection Bureau filed suit against CashCall, Delbert Services Corporation, and others to enforce the Consumer Protection Act of 2010[11] with respect to loans using identical loan agreements made by Western Sky in sixteen states and sold to CashCall is instructive. In *Consumer Financial Protection Bureau v. CashCall, Inc.*,[12] the United States District Court for the Central

---

WL 5091229 (Sup. Ct. of N. C., Wake County Business Ct., Aug. 27, 2015) (unpublished opinion) (finding that the last act necessary to form the loan agreements in that case (identical to those at issue here) occurred in North Carolina where the borrowers electronically signed the agreement).

[11] 12 USC § 5536 (a) (1) (B).

[12] 2016 WL 4820635, No. 15-07522, slip op. (C.D. Cal., Aug. 31, 2016). The *Consumer Financial Protection Bureau* case explains the lending enterprise set up by these parties as a scheme referred to as the "tribal model," whereby the parties attempt to avoid state usury laws and regulations by funding the loans through an entity located on an Indian reservation and asserting that the loans are not illegal under tribal law. Id. at (I) (B).

District of California found that CashCall and not Western Sky was the true lender and real party in interest in the loans identical to the ones at issue in this case, and no other reasonable basis exists for the parties' choice of CRST law. Likewise, this Court rejects the choice of law argument in this case.

Defendants also assert that tribal sovereignty, recognized by the Indian Commerce Clause,[13] precludes jurisdiction over this matter. According to Defendants, Webb is a member of the CRST. Because Western Sky is owned by Webb, Defendants assert Western Sky, a South Dakota limited liability company, is thereby imbued with the privileges and attributes of a tribal member under federal and tribal law. Pretermitting the issue of whether the status of a business entity's individual owner as a member of an Indian tribe imbues the business entity with the privileges, if any, held by the owner,[14] we hold that this State's jurisdiction is not defeated by tribal sovereignty. "Absent express federal law to the contrary," Native Americans who conduct activities beyond reservation boundaries are generally subject to non-discriminatory civil and criminal laws. *Mescalero Apache Tribe v. Jones*, 411 U. S. 145, 148-149 (I) (93 SCt 1267, 36 LE2d 114) (1973). Defendants cite no federal law prohibiting the State of Georgia from enforcing its criminal laws against persons and entities whose activities cross the reservation boundary into this State, as do the activities at issue in this case. Here, the State alleges that Defendants offer and make usurious loans to Georgia borrowers by use of interstate commerce, and the record reflects no evidence or assertion that any Georgia borrowers travelled outside Georgia for any reason related to the application, funding, or repayments of loans Defendants made to them. Other state and federal courts, in cases involving these same Defendants and their lending practices, have rejected the argument that tribal sovereignty defeats state court jurisdiction over them to enforce state law for off-reservation activities.[15] We reject that argument, as well.

---

[13] The United States Constitution, in the section defining the powers of Congress, grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes." U. S. Const. art. 1, § 8, cl. 3.

[14] This assertion by Western Sky has been rejected by at least one other court. See *State ex rel. Swanson v. CashCall, Inc.*, 2014 WL 4056028 *2 (Minn. Ct. App., Aug. 18, 2014) (unpublished opinion).

[15] See, e.g., *Colorado v. Western Sky Financial, LLC*, 845 FSupp.2d 1178 (D. Colo. 2011) (in an action seeking injunctive relief and damages for alleged violation of Colorado laws, the federal court found that offering loans via the Internet constitutes off-reservation activity and remanded the case back to state court); *State ex rel. Cooper*, supra, 2015 WL 5091229 *10 ("North Carolina [is not] prevented from asserting jurisdiction over Defendants, by the fact that Western Sky is owned by a Native American."); *State ex rel. Swanson*, supra, 2014 WL

Finally, Defendants argue the trial court lacks personal jurisdiction over Webb. Having moved to dismiss the complaint on that ground, Defendants bear the burden of proof. See *Beasley v. Beasley*, 260 Ga. 419, 420 (396 SE2d 222) (1990). The complaint alleges Webb personally "directed, controlled, managed, authorized, or participated" in the common enterprise of allegedly illegal acts of Western Sky and CashCall, and that the court has jurisdiction over Webb and the other Defendants pursuant to Georgia's Long Arm Statute, OCGA § 9-10-91. Webb filed an affidavit in support of the motion to dismiss averring, among other things, that he owns no real property in Georgia and has no ownership interest in any business enterprise based in Georgia. Webb acknowledges he is the sole member of Western Sky Financial, LLC. But Defendants presented no evidence to refute the primary allegations asserting long arm jurisdiction over Webb as a result of his having allegedly "directed, controlled, managed, authorized, or participated" in the illegal enterprise conducted by Western Sky and CashCall. Pursuant to the standard set forth in *Amerireach.com, LLC v. Walker*,[16] the complaint alleges sufficient grounds to assert personal jurisdiction over Webb, and Defendants did not meet the burden of disproving these allegations.[17]

For these reasons, we affirm the trial court's denial of Defendants' motion to dismiss.

2. (a) Defendants also argue several reasons why the injunction order should be vacated. First, Defendants assert the Payday Lending Act confers no authority for the State to obtain injunctive relief. While the Act does not expressly authorize injunctive relief, we view

---

4056028 *4 (rejecting the lenders' immunity argument as a ground for dismissing the state's consumer enforcement action where, as here, the allegations concerned activity occurring off the reservation).

[16] 290 Ga. 261, 264-269 (2) (719 SE2d 489) (2011) (rejecting the "fiduciary shield" doctrine of insulating corporate officers from claims of long arm jurisdiction for actions performed in a corporate capacity, and holding that employees and officers may be subject to jurisdiction " 'if [they] were primary participants in the activities forming the basis of jurisdiction over the corporation.' " (Citation omitted.))

[17] On motion for reconsideration, relying upon *Rogers v. Tennessee*, 532 U. S. 451, 457 (121 SCt 1683, 149 LE2d 697) (2001), Defendants argue that by disregarding the clear and unambiguous statutory language stating payday loans do not involve interstate commerce, this Court's holding unforeseeably expands the scope of the Act and violates due process considerations by applying an unforeseen and retroactive judicial expansion of statutory language. But we are unpersuaded by this argument because the plain language of OCGA § 16-17-2 (a) prohibits the making of loans of $3,000 or less through "the Internet," thus providing Defendants notice that their Internet-based, small-dollar lending enterprise was unlawful under the Act. In fact, it appears that in an effort to evade Georgia's law, Defendants engaged in what has been called a "tribal model" whereby they attempted to rely upon the alleged sovereignty of Western Sky as a purported tribal member-owned business. Not only this Court, but others, have found this contrivance to be unavailing. See, e.g., *Consumer Financial Protection Bureau v. CashCall, Inc.*, supra at note 12.

the language of the Act as contemplating such relief. Pursuant to OCGA § 16-17-3, any person who violates OCGA § 16-17-2 (a) or (b) is *"barred from the collection of any indebtedness* created by [an illegal] loan transaction" and any such illegal loan shall be deemed void ab initio. (Emphasis supplied.) OCGA § 16-17-3 also establishes that any offending lender shall be "liable to the borrower in each unlawful transaction for three times the amount of any interest or other charges to the borrower." Pursuant to subsection (a) of OCGA § 16-17-4, any person who violates OCGA § 16-17-2 (a) or (b) shall be liable to the State for a civil penalty equal to three times the amount of any interest or charges to the borrowers in such transactions. We do not interpret sections 3 and 4 of the Act as creating separate remedial schemes whereby the right to seek an order barring collections of illegal loans is available only in actions pursued by borrowers. Indeed, OCGA § 16-17-4 (b) authorizes the filing of a civil action pursuant to OCGA § 16-17-2 by either the Attorney General, any district attorney, or a private party. Defendants point to no reason why the remedy of a judgment barring collection of any indebtedness created by an illegal loan transaction and declaring such a transaction to be void ab initio should not be available in an action filed by the Attorney General. Generally, a writ of injunction may be used to enjoin illegal conduct for which no adequate remedy is provided at law.[18] See OCGA § 9-5-1. In its amended complaint, the State asserted it was entitled, pursuant to the Payday Lending Act, to injunctive relief declaring illegal Georgia loans to be null and void ab initio and prohibiting Defendants from, among other things, collecting interest or principal payments on any illegal loan made to a Georgia borrower. We reject Defendants' argument that injunctive relief to bar the collection of illegal loans and the right to have the loans at issue in this matter deemed void is unavailable to the Attorney General.

(b) Defendants, however, assert the injunction order entered in this case imposes an unlawful prejudgment attachment. The initial temporary restraining order entered shortly after the amended complaint was filed was replaced by an interlocutory injunction order ("Original Injunction"), dated August 23, 2013, that enjoined Defendants from making unsecured loans to Georgia borrowers in the amount of $3,000 or less and further enjoined them from selling or transferring to third parties the rights to such loans already made; but at the urging of Defendants, the order expressly did not prevent them from servicing the loans at issue in the litigation, meaning that

---

[18] A discussion of whether or not injunctive relief is barred because the State has an adequate remedy at law is discussed in Division 2 (b), infra.

Defendants were permitted to continue to collect payments from borrowers. As noted above, in a separate agreement between Cash-Call and the Attorney General, adopted by the trial court as a Consent Order, CashCall agreed to place the sum of $200,000 into an escrow account. Contrary to the State's assertion, however, the record reflects that the Original Injunction was not made contingent upon the escrow agreement, and the obligation to escrow funds in the Consent Order was not part of the injunctive relief granted.

In response to the State's motion to modify the interlocutory injunction order, the trial court entered its Order Granting Further Injunctive Relief ("Modified Injunction"), dated October 21, 2015. In the Modified Injunction the trial court found that, notwithstanding Defendants' compliance with the Original Injunction, the State was entitled to additional equitable relief pursuant to OCGA § 16-17-3 because, the court found, "[t]here is a substantial threat that [the State] will suffer irreparable injury if the injunction is not granted, as there may not be sufficient funds available to [the State] in the event final judgment is entered against Defendants." In addition to other findings supporting the grant of the injunction, the trial court further found that the threatened injury outweighs the threatened harm to Defendants from the injunctive relief granted, and that "there is a substantial likelihood that [the State] will prevail on the merits of its claims at trial." The trial court noted that modifications of injunctive orders "cannot be granted in the absence of a meritorious showing that such modification should be made." *Kelley v. Kelley*, 228 Ga. 639, 640 (187 SE2d 284) (1972). Taking these issues into consideration, the trial court ordered Defendants to continue servicing the loans at issue, but, for the first time, enjoined Defendants from retaining any funds collected from borrowers on those loans. The Modified Injunction ordered Defendants to deposit into the registry of the court the approximately $15 million sum they had collected from borrowers since the inception of the litigation and to make quarterly deposits for future collections. The purpose of the injunctive relief ordered was "to ensure that money will be available to satisfy an anticipated final judgment in favor of [the State]."

Defendants assert this freezing of assets is an improper use of the court's injunctive power and amounts, in effect, to an illegal prejudgment attachment. Defendants note that specific procedures must be followed before a writ of prejudgment attachment may be issued (see OCGA § 18-3-9), which the State did not follow. Further, injunctive relief is not available simply to ensure the availability of assets for collection in the event the plaintiff prevails in a case in which only monetary relief is sought and therefore an adequate remedy at law exists. See *Century Bank of Ga. v. Bank of America, N.A.*, 286 Ga. 72,

73-74 (1) (685 SE2d 82) (2009); *Housing Auth. v. MMT Enterprises, Inc.*, 267 Ga. 129 (1) (475 SE2d 642) (1996). See also OCGA § 9-5-6 (generally, creditors without liens may not enjoin debtors from disposing of property). But this is not a case in which the plaintiff seeks only a money judgment, nor does the injunction freeze assets in which no equitable interest was claimed. Applying the Federal Rules of Civil Procedure, the Supreme Court of the United States has recognized a distinction between the injunctive relief available to the plaintiff in a suit seeking equitable relief and the preliminary relief available to a creditor seeking equitable assistance in the collection of a debt. See *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U. S. 308, 325 (III) (B) (119 SCt 1961, 144 LE2d 319) (1999). See also 3 Moore's Federal Practice — Civil § 65.20 (3d ed. 2015). The Eleventh Circuit, applying the Federal Rules, determined that "[a] request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Intl. Trading, Inc.*, 51 F3d 982, 987 (V) (A) (11th Cir. 1995) (in which plaintiff sought the equitable remedy of receiving the defendant's profits pursuant to the federal statute authorizing equitable recovery of profits and other damages for trademark infringement).

Likewise, this Court, applying Georgia law, has held that injunctive relief may be available in cases in which equitable relief is sought.

> In deciding whether to issue an interlocutory injunction, the trial court should consider whether: (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of [the] claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest. Although an interlocutory injunction is an extraordinary remedy, and the power to grant it must be prudently and cautiously exercised, the trial court is vested with broad discretion in making that decision. We will not reverse the trial court's decision to grant or deny an interlocutory injunction unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court manifestly abused its discretion.

(Citation and punctuation omitted.) *SRB Investment Svcs., LLLP v. Branch Banking and Trust Co.*, 289 Ga. 1, 5 (3) (709 SE2d 267) (2011). The *SRB* case involved a creditor's claim alleging fraudulent transfers, and the defendants' primary argument for reversing the trial court's interlocutory injunction imposing an asset freeze or, alternatively, the deposit of a substantial sum into the registry of the court, was that the plaintiff had an adequate remedy at law by collecting money damages or by foreclosing on secured property. But this Court noted "that the ultimate availability of a judgment for money damages has never precluded an interlocutory injunction when fraudulent transfers are at issue." Id. at 5-6.

While the State's action in this matter does not allege fraudulent transfers, it does allege illegal collection of principal and interest on illegal loans made to Georgia borrowers and is, therefore, analogous. In fact, this Court applied the same rule affirming injunctive relief in favor of the State in a case in which, like this one, the State sued alleged violators of a criminal statute. In *Pittman v. State of Ga.*, 288 Ga. 589 (706 SE2d 398) (2011), the State alleged violation of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act and asserted it was entitled to the statutory relief of an order divesting the alleged wrongdoers of any interest in the illegal enterprise or property related to the RICO violations. The State also sought the appointment of a receiver. The trial court granted the State's motion for injunctive relief which, among other things, prohibited the alleged wrongdoers from disposing of the assets of their business. This Court affirmed that order, finding that

> where the [defendants] controlled the assets that are a subject of the litigation, raising the possibility that they could be dissipated before the litigation is resolved, the trial court did not abuse its discretion in enjoining the [defendants] from disposing of any of the . . . assets of the business and continuing the receivership.

Id. at 593 (2).

Here, the trial court expressly considered the factors set forth in *SRB*, supra, and concluded the evidence supported the grant of interlocutory injunctive relief. Defendants, however, assert the State failed to present competent evidence to support its request for injunctive relief and they claim the State relied solely on unfounded suspicions of Defendants' insolvency. Defendants state that the only evidence presented was unauthenticated hearsay evidence submitted by attachments to affidavits filed after the motion hearing, to which they raised objections, that, for example, Western Sky had laid

off nearly all its employees in 2013 and suspended its operations, and evidence that a multi-million-dollar judgment had been entered against CashCall in West Virginia in a case in which the Supreme Court had recently denied certiorari.[19] This hearsay evidence goes primarily to the first factor set forth in *SRB* — whether there is a substantial threat the State will suffer irreparable injury if the injunction is not granted — because of the likelihood of Defendants' insolvency. This Court has declared that the first factor "is the most important one, given that the main purpose of an interlocutory injunction is to preserve the status quo temporarily to allow the parties and the court time to try the case in an orderly manner." *Bishop v. Patton*, 288 Ga. 600, 604-605 (3) (a) (706 SE2d 634) (2011). But, clarifying our holding in *Bishop*, this Court has also stated that proof of all four factors is not required in order to obtain an interlocutory injunction. See *SRB*, supra, 289 Ga. at 5, footnote 7. Despite the lack of direct evidence of Defendants' net worth, given the evidence of a recently final substantial judgment against CashCall, the primary defendant in this matter, we cannot conclude the trial court abused its discretion in concluding the State would likely suffer irreparable harm if the injunction is not issued. Further, the State represented to the trial court, which representation was not challenged, that the State sought information about Defendants' assets and liabilities in discovery, but Defendants had failed or refused to produce that information.

Addressing the second factor, which requires a balancing of the relative equities of the parties, quoting *Garden Hills Civic Assn., Inc. v. Metropolitan Atlanta Rapid Transit Auth.*, Defendants argue an injunction should not be granted if it "would operate oppressively on

---

[19] *CashCall, Inc. v. Morrisey*, 2014 WL 2404300 (W. Va. 2014), cert. denied, ___ U. S. ___ (135 SCt 2050, 191 LE2d 956) (2015). We note that, although the final decision was not available to the trial court, the State showed in a supplemental brief filed in this Court that summary judgment was entered against CashCall and other Defendants in the case now before us on August 31, 2016, in the *Consumer Financial Protection Bureau* case (see footnote 12, supra), in an amount to be determined later but which can be expected to be significant and possibly result in insolvency. The trial court was aware the *Consumer Financial Protection Bureau* case was pending, however, and that some or all of these Defendants had been sued in both federal and state courts for claims relating to their lending practices in at least seventeen states.

We also note that at least seven federal circuit courts, applying the Federal Rules of Civil Procedure and the Federal Rules of Evidence, permit a trial court to rely on hearsay evidence for the purpose of ruling on a motion for preliminary injunctive relief. See *Mullins v. City of New York*, 626 F3d 47, 51-52 (I) (2010). And under Georgia's old Evidence Code, the rules of evidence were not as rigidly enforced in an interlocutory hearing. See, e.g., *Griffith v. City of Hapeville*, 182 Ga. 333 (4) (185 SE 522) (1936). Pursuant to Georgia's new Evidence Code, however, only specific proceedings are exempt from the rules of evidence, and interlocutory injunction proceedings are not expressly exempted. See OCGA § 24-1-2; *Parker v. State*, 296 Ga. 586 (2) (a) (769 SE2d 329) (2015); Paul S. Milich, Georgia Rules of Evidence, § 1:2.

the defendant's rights . . . ."[20] But since the trial court found a substantial likelihood that the State will prevail on the merits of the claims at trial, and Defendants have failed to demonstrate on appeal that they have any "right" to retain illegally collected funds, we cannot conclude the trial court erred in determining the threat of injury to the State in this matter outweighs the threat of injury to Defendants.[21]

Turning to the third factor, given the applicable law and facts of record, the trial court did not err in concluding a substantial likelihood exists that the State will prevail in this case. Nor did the trial court err in concluding the injunction will not disserve the public interest, thus satisfying the fourth factor set forth in *SRB*. In fact, since the trial court concluded the State was likely to prevail, the granted injunctive relief is likely to serve the public interest. Despite the hearsay nature of much of the State's evidence relating to Defendants' potential insolvency, we find the State presented sufficient evidence to demonstrate it was entitled to injunctive relief, and because we find the trial court did not manifestly abuse its discretion in granting the requested relief, we affirm the trial court's grant of the Modified Injunction.

### State's Appeal, Case No. S16X1012

3. The State's complaint, as amended, was filed on August 5, 2013. Reddam is the sole shareholder of Defendants CashCall and Delbert Services. Webb is the sole shareholder of Western Sky. In June and July 2015, in response to discovery, Defendants produced copies of certain written agreements, including agreements between Western Sky and WS Funding, which is a wholly-owned subsidiary of CashCall and, as alleged by the State, controlled, along with Cash-Call, by Reddam. Reddam executed these agreements on behalf of WS Funding, and Webb executed them on behalf of Western Sky. The

---

[20] (Citation and punctuation omitted.) 273 Ga. 280, 281-282 (1) (539 SE2d 811) (2000).

[21] For this reason we also reject Defendants' assertion that the Modified Injunction violates the principle that injunctive relief should maintain the status quo. An interlocutory injunction "is a stop-gap measure to prevent irreparable injury or harm to those involved in the litigation." *India-American Cultural Assn., Inc. v. iLink Professionals, Inc.*, 296 Ga. 668, 670 (769 SE2d 905) (2015). Given the findings on which the injunction was based in this case, we conclude the injunction order does maintain the status quo by providing a "stop-gap measure" that prevents the assets currently available to satisfy the equitable relief sought in the complaint from being unavailable at the time a judgment may be entered in the case. See 11A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2948 (3d ed.) (noting that it may be necessary to require a defendant to disturb the status quo "in order to preserve the power of the court to render a meaningful decision," and the fact that this would effect a change in the current situation, alone, should not bar relief).

State claims these agreements demonstrate Reddam and WS Funding ("Proposed Defendants") were involved in a common enterprise with the currently named Defendants to make illegal loans to Georgia borrowers and, even now that lending has been suspended, to collect illegal payments on those loans. On that ground, the State filed a motion to amend the complaint to add the Proposed Defendants as parties. The trial court denied this motion, and when Defendants filed their appeal of the order denying the motion to dismiss the complaint and the order denying their motion to vacate the injunction, the State filed this cross-appeal. For the reasons set forth below, we reverse the order denying the motion to add the Proposed Defendants in this case.

One of the written agreements produced by Defendants is an assignment agreement whereby WS Funding agreed to the following: to fund a reserve account in Western Sky's name that would be used by Western Sky to fund consumer loans; to purchase all loans made by Western Sky for a fixed percentage of their face value; and to pay Western Sky monthly administration fees and reimburse it for other operating costs. In return, Western Sky agreed to sell all loans made in its name to WS Funding for a fixed percentage of their face value. Another agreement is one for services between CashCall and Western Sky whereby CashCall agreed to the following: to develop promotional materials for Western Sky; to provide customer service support for Western Sky, including underwriting review, marketing, and website hosting and support services; to assign Western Sky toll-free phone and fax numbers; and to provide Western Sky communication services such as e-mail and text correspondence with borrowers. In return, Western Sky agreed to pay CashCall a fixed percentage of the face value of the loans for the services CashCall would provide. Pursuant to these agreements, the loans Western Sky made were to be electronically signed by borrowers in a previously agreed-upon form, and would only be executed by Western Sky if borrowers met previously agreed-upon underwriting criteria. The State alleges these agreements govern the lending that Western Sky offered and made to Georgia borrowers, who applied for loans over the Internet or telephonically.

Discovery in the action was stayed for periods of time while the trial court considered preliminary motions, while the parties attempted to reach a mediated settlement, and while Defendants previously sought interlocutory review of the order denying their motion to dismiss. When discovery resumed after this Court denied Defendants' application for interlocutory appeal, Defendants produced the agreements described above. Asserting that these agreements reflected newly discovered evidence of the Proposed Defendants' involvement

in the common enterprise to make and service illegally usurious loans, on September 8, 2015, the State filed its motion to amend the complaint to add them as defendants.

(a) While OCGA § 9-11-15 (a) permits amendment of pleadings as a matter of right prior to the entry of a pretrial order, that provision must be read in pari materia with OCGA § 9-11-21, which provides that "[p]arties may be dropped or added by order of the court on motion of any party . . . at any stage of the action and on such terms as are just." See *Clover Realty Co. v. Todd*, 237 Ga. 821, 821 (229 SE2d 649) (1976). On appeal, a trial court's decision on a motion to add a party to an existing action is reviewed for abuse of discretion. See *Parks v. Hyundai Motor America, Inc.*, 258 Ga. App. 876 (575 SE2d 673) (2002). Citing *Ford Motor Co. v. Conley*,[22] the State asserts that abuse of discretion is shown when the trial court applies an incorrect legal standard, misapplies the correct legal standard to the facts, or relies on clearly erroneous factual findings. The order denying the motion to add parties contained no findings of fact or conclusions of law, but stated the denial was based upon a consideration of all matters of record, including briefs and other submissions by the parties. The State asserts the trial court misapplied the proper legal standard or based its decision on erroneous facts in this case.

> Among the factors to be considered by the trial court in determining whether to allow [an amendment to add a new party] are whether the new party will be prejudiced thereby and whether the movant has some excuse or justification for having failed to name and serve the new party previously.

*Aircraft Radio Systems, Inc. v. Von Schlegell*, 168 Ga. App. 109, 111 (2) (308 SE2d 211) (1983). The moving party carries the evidentiary burden regarding these factors. *Sargent v. Dept. of Human Resources*, 202 Ga. App. 874 (415 SE2d 918) (1992). Defendants contend the State failed to establish either of these factors in this case.

With respect to excusable delay, Defendants assert the State had notice from the time the amended complaint was filed in August 2013 that WS Funding was involved in the lending transactions with Georgia borrowers, and that WS Funding was a wholly owned subsidiary of CashCall, since those facts were alleged in the amended complaint.[23] Also, an affidavit attached to the State's motion for a

---

[22] 294 Ga. 530, 538 (2) (757 SE2d 20) (2014).

[23] Specifically, the amended complaint alleged that within days after Western Sky funded a loan, borrowers were notified the loan had been sold to WS Funding and that it would be serviced by CashCall.

temporary restraining order showed the State was aware of information that Reddam was the sole owner of CashCall and that WS Funding was a wholly owned subsidiary of CashCall. In fact, the record reflects that in January 2014, the State attached to its brief opposing Defendant's motion to dismiss a copy of the assignment agreement between WS Funding and Western Sky and the service agreement between Western Sky and CashCall, both of which the State asserts were newly discovered after Defendants produced documents to the State in June and July of 2014. Because the sole reason offered for the delay in seeking to add the Prospective Defendants was that the evidence of their involvement in the lending scheme was only recently produced, we agree with Defendants that the State failed to carry its burden of showing excuse or justification for having previously failed to name and serve these new parties.

Delay alone, however, is an insufficient ground for denying the addition of parties. In fact, "denial of joinder is an abuse of discretion where delay is the sole reason for denial; there must be more shown, i.e., prejudice to the additional defendant by delay." *Smith v. Vencare, Inc.*, 238 Ga. App. 621, 629 (3) (a) (519 SE2d 735) (1999). Further, where the statute of limitation has not expired as to the plaintiff's theory of recovery, a new party's rights to a defense on the merits is not prejudiced. Id. Reserving the discussion of the statute of limitation issue to Division 3 (b), below, we find the State did carry its burden of demonstrating that the Proposed Defendants will not be unfairly prejudiced by their addition as parties. Although the legal issues involved in Defendants' appeal will have been decided prior to the joinder of the Proposed Defendants, given the relationship of the parties and the posture of the case, we conclude they will not be unfairly prejudiced. The evidence shows the Proposed Defendants are closely intertwined with Defendants and share an identity of interest with them. Reddam and WS Funding, by and through Reddam, are undoubtedly well aware of this case, the issues raised by the case, and the positions taken by the parties to date because CashCall has been involved in all the pleadings and hearings conducted to date in this action. These facts negate the existence of any prejudice to the Proposed Defendants. See *Shiver v. Norfolk-Southern Ry. Co.*, 220 Ga. App. 483, 484 (469 SE2d 769) (1996) (reversing the denial of plaintiff's motion to amend the complaint to add a closely related party); *Horne v. Carswell*, 167 Ga. App. 229, 230 (306 SE2d 94) (1983) (vacating the order denying plaintiff's motion for leave to amend to add a party and remanding for a new hearing on the matter). As the parties are in the initial stage of discovery, the Proposed Defendants will have ample opportunity to raise any and all defenses available to them. Notably, the interlocutory orders entered

by the trial court do not apply to the Proposed Defendants, and they will have the opportunity to respond to any effort by the State to seek, for example, injunctive relief against them.

(b) These legal rules support a finding of no unfair prejudice to the Proposed Defendants, however, only if the applicable statute of limitation has not expired. The issue becomes whether the State's action is subject to the default twenty-year limitation period granted by OCGA § 9-3-22, or by the one-year statute of limitation found in OCGA § 7-4-10, as Defendants urge.

The Payday Lending Act contains no express limitation period for asserting a claim under the Act. The State asserts this means the general statute of limitation for enforcement of statutory rights set forth in OCGA § 9-3-22 applies to its claims against Defendants and Proposed Defendants. That statute states, in pertinent part: "All actions for the enforcement of rights accruing to individuals under statutes . . . shall be brought within 20 years after the right of action has accrued . . . ." Pursuant to OCGA § 9-3-1, the State's claims in this case are governed by the same limitations as those that apply to private persons.[24] "Where the statute of limitations has not run as to a theory of recovery, an amendment allowing joinder of an additional party does not prejudice the party's rights to a defense on the merits." *Smith v. Vencare, Inc.*, supra, 238 Ga. App. at 629 (3) (a). The State asserts that since the statute of limitation for its claims has not expired, then as a matter of law, the Proposed Defendants will not be prejudiced by being added as parties to the action.

Defendants, however, argue that because the State's claims sound in usury, and the express purpose of the Payday Lending Act is to enforce violations of the usury statute,[25] then the State's complaint is governed by the one-year statute of limitation for usury claims, as set forth in OCGA § 7-4-10 (d). But significant distinctions exist between the remedies available under an enforcement action brought pursuant to the Payday Lending Act and the rights granted to a borrower in OCGA § 7-4-10 (d). Subsection (a) of OCGA § 7-4-10 establishes that a lender that violates the usury statute forfeits its right to collect the entire interest charged on the loan, but expressly allows for no further forfeiture or penalty. Subsection (b) grants the borrower the right of setoff of any amount so forfeited in any action brought by the lender to recover the principal sum loaned. And

---

[24] OCGA § 9-3-1 states: "Except as otherwise provided by law, the state shall be barred from bringing an action if, under the same circumstances, a private person would be barred."

[25] Defendants note that OCGA § 16-17-1 (c) declares the types of loans covered by the Act to be those in violation of OCGA § 7-4-2.

subsection (d) establishes a one-year limitation period for any action brought by the borrower to recover forfeited interest. In sum, OCGA § 7-4-10 grants borrowers the right to enforce interest rate caps in forfeiture actions for any and all interest paid. It does not, however, relieve the borrower from the duty to repay the principal amount owed.

By contrast, the Payday Lending Act sets forth an enforcement regime that imposes much harsher remedies against a lender that violates the usury laws by engaging in the type of predatory conduct described by the Act. A lender who violates the Payday Lending Act is barred from collecting any indebtedness created by the unlawful loan, not just interest, and declares such a loan transaction to be "void ab initio." OCGA § 16-17-3. Such a lender is liable to the borrower for three times the amount of any interest or other charges imposed by the transaction (OCGA § 16-17-3) and is liable to the state for a civil penalty equal to three times that amount (OCGA § 16-17-4). The Act also imposes a penalty in the form of a tax on all proceeds the lender receives from such a transaction. OCGA § 16-17-5. The remedial schemes of the two statutory provisions are distinct, and the Payday Lending Act expressly states that its purpose is to create new, different, and more onerous remedies and penalties upon lenders who engage in the conduct prohibited by the Act than those already in existence. "The General Assembly has . . . determined that substantial criminal and civil penalties over and above those currently existing under state law are necessary in order to prohibit [payday lending] activity in the State of Georgia and to cause the cessation of this activity once and for all." OCGA § 16-17-1 (c). Additionally, the State is not a party to the lending transactions at issue in this case, and thus the remedies available to borrowers under OCGA § 7-4-10 are not available to the State. Either a borrower or the State, as a representative of borrowers or an ascertainable class of borrowers, may pursue the remedies available under OCGA §§ 16-17-3 and 16-17-4, however. We conclude both the purpose and remedies of the Payday Lending Act are distinct from those of the forfeiture provisions of OCGA § 7-4-10. It follows that the one-year statute of limitation set forth in OCGA § 7-4-10 does not apply to an action brought under the Payday Lending Act.

Citing *Parker v. Fulton Loan and Bldg. Assn.*,[26] Defendants assert that usury statutes are simply codifications of common law principles; they assert that the twenty-year statute of limitation of OCGA § 9-3-22 applies only in special cases where the underlying

---

[26] 42 Ga. 451, 454-455 (1871).

right being pursued lacks an origin in the common law; and thus they argue that this case is not subject to the twenty-year statute of limitation for the enforcement of rights accruing under statutes. First, in a detailed discussion of the origins of Georgia's usury laws, this Court in *Thomas v. Clarkson*[27] concluded that a limitation for charges imposed for use of money did not exist at common law and that usury is a creature of legislation. Certainly, the remedies that may be pursued with respect to a loan that includes an illegal interest rate are defined by statute, and it was the statutory right to recover illegal interest paid to the lender that was the subject of the action in *Parker*. Moreover, the right of a governmental authority to enforce usury laws and to recover a penalty on behalf of the borrower as well as to recover a penalty owed to the state is a statutorily created right, and not one that exists at common law. See *Lanier v. Consolidated Loan and Finance Co.*, 47 Ga. App. 148 (170 SE 99) (1933) (construing the Small Loan Act of 1920 (Ga. L. 1920, p. 219, § 13), a precursor of the Industrial Loan Act, OCGA § 7-3-1 et seq., which like the Payday Lending Act provides an enforcement regime for loans of $3,000 or less, and finding that act to be in derogation of common law). Long ago this Court determined that the twenty-year statute of limitation granted by OCGA § 9-3-22 applies "to rights which arise under legislative enactment, and which would not exist except for some act of the legislature." *Williams v. Clemons*, 178 Ga. 619 (1) (173 SE 718) (1934). Since the rights granted by the Payday Lending Act are purely statutory, the twenty-year statute of limitation applies to claims brought pursuant to that Act.

As another ground for asserting a one-year statute of limitation should apply to the State's action pursuant to the Payday Lending Act, Defendants point to OCGA § 9-3-28, which states: "All actions by informers to recover any fine, forfeiture, or penalty shall be commenced within one year from the time the defendant's liability thereto is discovered or by reasonable diligence could have been discovered." Since the State was or should have been aware of its claims against the Proposed Defendants more than one year before the State sought to add them, Defendants argue the claims against Proposed Defendants are now barred by application of OCGA § 9-3-28. Implicit in this assertion is the notion that the State may recover only for damages dating back one year from the date the action was filed against the original Defendants, as recovery of damages beyond the one-year limitation period, if it applies, would be barred. Informer actions, the subject of OCGA § 9-3-28, are a subset of qui tam actions, which are

---

[27] 125 Ga. 72 (4) (54 SE 77) (1906).

actions to recover damages on behalf of the state, as well as for the named plaintiff, for a violation of law. For a general discussion of the English common law origins of qui tam actions and the American adoption of qui tam, see The History and Development of Qui Tam, 1972 Wash. U. L. Q. 81, 85-90 (1972) (available at http://openscholarship. wustl.edu/law_lawreview/vol1972/iss1/7). See also *Vt. Agency of Nat. Resources v. United States ex rel. Stevens*, 529 U. S. 765, 775-777 (II) (120 SCt 1858, 146 LE2d 836) (2000). Eventually, common law actions were replaced by statutory rights of action, and two forms of statutory qui tam arose — one for mere informers who were not aggrieved parties but could nevertheless sue for a share of the penalty recovered for the legal violation as a bounty, and one for actual aggrieved parties who could sue for statutory remedies to be shared with the Crown. See *Vt. Agency of Nat. Resources*, supra, 529 U. S. at 775 (II); Wash. U. L. Q., supra, at 90-91. Informer actions were subject to abuse for collusion with the wrongdoer or harassment of alleged wrongdoers. As a result, statutes were passed to deter vexatious informers, including the institution of short statutes of limitation. See 529 U. S. at 775-776. By its terms, OCGA § 9-3-28, imposing a one-year statute of limitation, applies to "actions by informers." It does not apply to actions by aggrieved parties.

In *Nixon v. Nixon*,[28] this Court reviewed a series of cases in which this Court and federal courts applying Georgia law considered whether the twenty-year statute of limitation provided by OCGA § 9-3-22, or a shorter limitation period, should apply. This Court concluded that the twenty-year period of limitation applies to "any statute specifically conferring rights upon an individual or a class to which an individual belongs." *Nixon*, supra, 196 Ga. at 150 (2). By contrast, statutes that confer rights upon the general public do not come within the twenty-year limitation of OCGA § 9-3-22. Id. at 152 (2). By its terms, the Payday Lending Act grants a right of action to individuals or a class of individuals. "A civil action under Code Section 16-17-2 may be brought on behalf of an individual borrower or on behalf of an ascertainable class of borrowers." OCGA § 16-17-3. The Code section permitting the State to recover a civil penalty in an action filed under OCGA § 16-17-2 permits the Attorney General, any district attorney, or a private party to pursue those rights. OCGA § 16-17-4.[29]

---

[28] 196 Ga. 148 (26 SE2d 711) (1943) (superseded by statute on other grounds, see *United States v. First Nat. Bank and Trust Co.*, 297 F2d 312 (5th Cir. 1961)).

[29] This action was brought on behalf of the State "ex rel." Attorney General Samuel S. Olens, meaning as a relator (see Black's Law Dictionary, 10th ed. (2014)). Although, strictly speaking, this case was brought on behalf of the State by the Attorney General as relator, the

In summary, we are not persuaded that the legislature intended the period of limitation for bringing an enforcement action pursuant to the Payday Lending Act to be governed by the one-year limitation period for forfeiture actions pursuant to the usury laws. Instead, we conclude the remedies set forth in the Payday Lending Act are governed by the twenty-year statute of limitation set forth in OCGA § 9-3-22.[30]

*Judgment affirmed in Case No. S16A1011. Judgment reversed in Case No. S16X1012. All the Justices concur.*

DECIDED OCTOBER 31, 2016
RECONSIDERATION DENIED DECEMBER 8, 2016.

*Parker Hudson Ranier & Dobbs, R. Lawrence Ashe, Jr., Nancy H. Baughan, William J. Holley II, Scott E. Zweigel; Skadden, Arps, Slate, Meagher & Flom, Joseph L. Barloon, Austin K. Brown, Jennifer Z. Gindin, Thomas J. Nolan, Clifford M. Sloan,* for appellants.

*Samuel S. Olens, Attorney General, Isaac Byrd, Deputy Attorney General, Daniel S. Walsh, Senior Assistant Attorney General, Charlene R. Swartz, Monica A. Sullivan, Timothy A. Butler, Andrew D. Chesser, Assistant Attorneys General,* for appellee.

---

relator here is not acting as a disinterested "informer." OCGA § 16-17-4 expressly authorizes the Attorney General to pursue a penalty for violation of the Payday Lending Act.

[30] Finally, we reject Defendants' assertion that the State is barred by the doctrine of invited error from asserting the trial court erred in denying the motion to add parties. Urging a trial court to decide a fully briefed motion so that it can be appealed, if necessary, at the same time other court orders are being appealed does not invite error.