NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 25, 2022

S22G0039. SONS OF CONFEDERATE VETERANS et al. v. HENRY COUNTY BOARD OF COMMISSIONERS.
S22G0045. SONS OF CONFEDERATE VETERANS et al. v. NEWTON COUNTY BOARD OF COMMISSIONERS.

PETERSON, Presiding Justice.

This *case* is about a highly controversial subject: whether local communities must continue displaying (and maintaining at public expense) monuments that celebrate the Confederacy and its long-dead supporters, despite those communities finding such celebration repugnant. But nothing about those monuments is at issue in this *appeal*.

Instead, this appeal presents only a discrete and important threshold question: whether the Georgia Constitution requires a plaintiff to establish some cognizable injury to bring a lawsuit in Georgia courts, i.e., to have standing to sue, separate and apart from

the statutory authorization to bring suit. This question has broad implications far beyond the underlying controversy.

After a full review of the relevant history and context, our answer is this: to invoke a Georgia court's "judicial power," a plaintiff must have a cognizable injury that can be redressed by a judicial decision. Courts are not vehicles for engaging in merely academic debates or deciding purely theoretical questions. We "say what the law is" only as needed to resolve an actual controversy. To that end, only plaintiffs with a cognizable injury can bring a suit in Georgia courts. Unlike federal law, however, that injury need not always be individualized; sometimes it can be a generalized grievance shared by community members, especially other residents, taxpayers, voters, or citizens.

The Georgia Constitution might impose a higher requirement when a plaintiff challenges the constitutionality of a statute; we have long held that in such cases, the plaintiff must show an actual, individualized injury. But we need not decide today whether this additional requirement arises from the Georgia Constitution, such

2

that the General Assembly cannot abrogate it by statute, because the plaintiffs in this case do not challenge a statute as unconstitutional.

For the lesser requirement — that the plaintiff has suffered some kind of injury, albeit one that may be shared by all other members of the community — Georgia has long recognized that members of a community, whether as citizens, residents, taxpayers, or voters, may be injured when their local government fails to follow the law. Government at all levels has a legal duty to follow the law; a local government owes that legal duty to its citizens, residents, taxpayers, or voters (i.e., community stakeholders), and the violation of that legal duty constitutes an injury that our case law has recognized as conferring standing to those community stakeholders, even if the plaintiff suffered no individualized injury.

Applying that framework to this case, T. Davis Humphries, as a private citizen, has standing to assert a claim for injunctive relief against her local county government for its planned removal of a Confederate monument in alleged violation of OCGA § 50-3-1. But

the other plaintiffs — the various Sons of Confederate Veterans entities — have not shown that they are members of the communities the governments of which they seek to sue, and they have alleged no other cognizable injury sufficient to establish their standing. The Court of Appeals was therefore wrong to affirm the dismissal of Humphries's complaint for a lack of standing as to her claim for injunctive relief, but it was right to affirm the dismissal of the complaints filed by the various Sons of Confederate Veterans groups. We do not reach the question of whether Humphries has standing for her claim for damages under OCGA § 50-3-1, because the cause of action that statute purports to create has not yet arisen; by the statute's terms, the cause of action arises only upon the occurrence of conduct prohibited by the statute, and that conduct has not yet occurred. Accordingly, we affirm the dismissal of Humphries's statutory claim for damages and all claims by the Sons of Confederate Veterans groups, and reverse the dismissal of Humphries's claim for injunctive relief.

1. *Background*

4

(a)    *The statute at issue.*

OCGA § 50-3-1 (b) makes it unlawful for any agency, including all state and local government entities,[1] or any officer of an agency (whether elected or appointed), to remove certain historic monuments, including monuments that honor the military service of soldiers of the Confederate States of America. See OCGA § 50-3-1 (b) (2). Additionally, "[n]o publicly owned monument erected, constructed, created, or maintained on the public property of this [S]tate or its agencies" or "on real property owned by an agency or the State of Georgia" can be relocated, removed, concealed, obscured, or altered in any fashion, except for the preservation, protection, and interpretation of such monuments. Id. § 50-3-1 (b) (3). A person or entity that damages or removes a monument without replacing it is liable for treble damages for the cost of repairing or replacing the

---

[1] The statute defines "agency" as "any state or local government entity, including any department, agency, bureau, authority, board, educational institution, commission, or instrumentality or subdivision thereof, and specifically including a local board of education, the Board of Regents of the University System of Georgia, and any institution of the University System of Georgia." OCGA § 50-3-1 (b) (1) (A).

5

monument, attorney's fees, and even exemplary damages. Id. § 50-3-1 (b) (4). The statute expressly authorizes suits by private parties or groups, not only public entities owning a monument:

> A public entity owning a monument or any person, group, or legal entity shall have a right to bring a cause of action for any conduct prohibited by this Code section for damages as permitted by this Code section. Such action shall be brought in the superior court of the county in which the monument was located.

OCGA § 50-3-1 (b) (5).

(b)   *Procedural history.*

As alleged in the relevant complaint, the Henry County Board of Commissioners in July 2020 voted to remove a Confederate monument from the courthouse square in McDonough. As a result of this vote, the Sons of Confederate Veterans, Colonel Charles T. Zachry Camp #108, and Georgia Division, Sons of Confederate Veterans, filed suit against the Board seeking injunctive relief and damages, asserting that the Henry County Board's vote signaled an intention to violate OCGA § 50-3-1 (b).

Less than a week later, Humphries filed a similar complaint

6

for damages and injunctive relief against the Newton County Board of Commissioners, in their official capacity, alleging that the county's intention to hold an expedited vote to remove a Confederate monument from downtown Covington and place it in storage would violate OCGA § 50-3-1 (b). The next day, the Newton County Board voted to remove the monument, prompting Sons of Confederate Veterans, General George "Tig" Anderson Camp #2038, and Georgia Division, Sons of Confederate Veterans, to file a complaint similar to Humphries's. Although each group phrased their allegations a bit differently from one another, the plaintiffs in Newton County all generally alleged that the County's votes directing action to remove the monuments did or would violate OCGA § 50-3-1 (b) (2) - (4).

Humphries brought her suit as a private citizen of Newton County. The Sons of Confederate Veterans organizations brought suit as "organizations of people who honor the memories and legacies of their forefathers who fought for freedom during the War Between the States[,]" but they made no other allegations about their members, including whether those members were citizens or

7

residents of their respective counties. All of the plaintiffs in all three suits alleged that the unlawful removal of the monument would cause them injury to their "rights and dignity." The plaintiffs alleged that they had standing under OCGA § 50-3-1 (b) (5).

A Newton County trial court consolidated, then dismissed, the two complaints filed against the Newton County Board of Commissioners. The Newton County trial court concluded that the plaintiffs in the Newton County suits lacked standing because they suffered no damages, as the monument in Covington had not been removed; that a 2019 amendment to OCGA § 50-3-1 (b) removed a party's ability to seek an injunction under the statute;[2] and that the claims were nevertheless barred by sovereign immunity. The trial court also issued a stay pending appeal, preventing Newton County from taking any action to remove the monument.

---

[2] Prior to the 2019 amendment, OCGA § 50-3-1 specifically permitted injunctive relief to prevent prohibited actions to remove publicly owned or displayed monuments. See OCGA § 50-3-1 (b) (3) (2004). Also, whereas the current version allows "any person, group, or legal entity" to bring a cause of action, the pre-2019 version specified that "any person or entity who suffered injury or damages as a result" of a violation of the statute could bring an action "to seek injunctive relief."

In Henry County, the trial court denied an emergency temporary restraining order, concluding that the plaintiffs' claims for injunctive relief were barred by sovereign immunity. Henry County then removed the monument, and the Henry County Board of Commissioners filed a motion to dismiss the complaint against it. They argued that the plaintiffs lacked standing to seek damages because they did not allege a concrete or particularized injury, that sovereign immunity barred a claim for damages, and that the claim for injunctive relief was moot because the county had already removed the monument. The trial court agreed with Henry County's position on all three grounds and dismissed the complaint.

All of the plaintiffs (collectively, the "Plaintiffs") appealed to the Court of Appeals. The Court of Appeals affirmed the dismissal of the Plaintiffs' complaints. See *Sons of Confederate Veterans v. Newton County Bd. of Commissioners*, 360 Ga. App. 798 (861 SE2d 653) (2021). Relying principally on federal case law decided under Article III of the U.S. Constitution, and recent Georgia case law supporting reliance on such federal precedent, the Court of Appeals held that

9

the plaintiffs lacked standing. The court reasoned that, although OCGA § 50-3-1 (b) (5) provided a cause of action, the "*constitutional* doctrine of standing *still* requires that a cause of action involve a concrete and particularized *injury*." Id. at 804-805 (2) (emphasis in original). The Court of Appeals went on to hold that "even when the legislature identifies and elevates intangible harms, a plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Id. at 804 (2) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (136 SCt 1540, 194 LE2d 635) (2016)). The Court of Appeals concluded that the plaintiff organizations alleged commitment to "honor[ing] the memories and legacies of their forefathers" and assertion that they would "suffer injury to [their] rights and dignity" were insufficient to establish standing. Id. at 805 (2). And the court, noting that Humphries "did not allege any degree of concern with the monuments beyond her status as a private citizen of Newton County[,]" concluded that her claim of injury was too "vague" and "abstract," as well. Id. at 805 (2).

10

Based on its conclusion that the plaintiffs lacked standing, the Court of Appeals declined to address whether sovereign immunity barred the plaintiffs' claims. See id. at 806 (3).

We granted the Plaintiffs' petitions for certiorari to consider whether the Georgia Constitution requires some cognizable injury to have standing to sue when OCGA § 50-3-1 does not expressly require it.

2. *The Georgia Constitution vests the judicial power in Georgia courts; although our history contains little express interpretation of this constitutional text, over a century of Georgia precedent delineating the boundaries of our courts' authority suggests that courts cannot exercise the "judicial power" to decide a case in which the plaintiff lacks a cognizable injury.*

No one disputes that the General Assembly generally has the power to change or modify the law to create duties and liabilities that never existed before. See *Fountain v. Suber*, 225 Ga. 361, 365 (169 SE2d 162) (1969). And generally, the plain meaning of statutory text "must be given effect." Id. (citation and punctuation omitted). The statute at issue here imposed a new duty on government agencies, and its plain text provides a cause of action to

"any person, group, or legal entity" to enforce that duty. See OCGA § 50-3-1 (b) (5). The statute does not itself require a plaintiff to have suffered any particular injury from the removal of a public monument. Accordingly, this statute allows the plaintiffs here to sue unless the Georgia Constitution or federal law provides otherwise.

Federal law does not control standing requirements in state courts, so we must examine whether the Georgia Constitution imposes an individualized-injury requirement for a plaintiff to have standing. If our standing requirements are constitutionally based, of course, those limitations control even in the face of a contrary statute; but if those requirements are instead merely derived from the common law (or decisional law), the General Assembly could displace them. See *Johns v. Suzuki Motor of America*, 310 Ga. 159, 164-165 (3) (850 SE2d 59) (2020) ("As long as legislation does not violate the Constitution, when the Legislature says something clearly — or even just implies it — statutes trump cases." (citation and punctuation omitted)); *Georgia Lions Eye Bank, Inc. v. Lavant*, 255 Ga. 60, 61-62 (2) (335 SE2d 127) (1985) (the common law "may

12

be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations" (citation and punctuation omitted)). Therefore, whether "*any* person, group, or legal entity" can pursue a cause of action under OCGA § 50-3-1 (b) (5), or whether the world of plaintiffs is cabined in some way, depends on whether our standing requirements arise from the Georgia Constitution, or from a lesser source.

The Plaintiffs argue that nothing in the Georgia Constitution requires a showing of an individualized injury and that they have standing under OCGA § 50-3-1 (b) (5).[3] The Henry County Board of Commissioners argues that standing requires the existence of an actual, justiciable controversy, which requires a party to have an

---

[3] The Plaintiffs argue that certain statutes recognize that each plaintiff — a citizen, a corporation, and unincorporated organizations — has the ability to bring suits in their own name. See OCGA §§ 9-2-24 ("An action may be maintained by and in the name of any unincorporated organization or association."); 14-3-302 (1) (providing that every corporation has power to "sue, be sued, complain, and defend in its corporate name"); see also *Clark v. Fitzgerald Water, Light & Bond Comm.*, 284 Ga. 12, 12 (663 SE2d 237) (2008) (recognizing three classes of legal entities with power to sue: "(1) natural persons; (2) an artificial person (a corporation); and (3) such quasi-artificial persons as the law recognizes as being capable to sue"). Although the Plaintiffs are correct that they generally have the *capacity* to sue (and be sued), that point is not relevant to whether they have *standing* to sue in this case.

13

individualized injury. The Henry County Board maintains that the plaintiffs' alleged injury to their "rights and dignity" is an insufficient injury to establish an "actual controversy." The Newton County Board of Commissioners argues that Georgia's standing doctrine has existed independently of federal jurisprudence and has long required that a plaintiff suffer damage or injury before resorting to the courts for enforcement of a legal right. To answer whether our standing requirements are of constitutional dimension and thus trump the statute, we must review what standing is and how we have treated it historically.

(a)  *Standing is necessary to invoke a court's judicial power, which at common law required an actual controversy.*

Standing is a jurisdictional prerequisite to a plaintiff's right to sue. See, e.g., *Black Voters Matter Fund Inc. v. Kemp*, 313 Ga. 375, 380 (1) (870 SE2d 430) (2022); *Ames v. JP Morgan Chase Bank, N.A.*, 298 Ga. 732, 740 (3) (d) n.6 (783 SE2d 614) (2016). A plaintiff with standing is necessary to invoke a court's judicial power to resolve a dispute, and the power of Georgia courts — as with any power

14

possessed by a branch of state government — is conferred by our state constitution. See *Thompson v. Talmadge*, 201 Ga. 867, 879 (2) (41 SE2d 883) (1947) ("The departments of the State government have and can exercise only such power as the people have conferred upon them by the Constitution."); *Beall v. Beall*, 8 Ga. 210, 219 (1850) ("From the Constitution, the legislative department, as well as every other part of the Government, derives its power[.]").

Because the Georgia Constitution is the source of the judicial power of state courts, federal standing requirements do not control our analysis. Those requirements are grounded in Article III's limitation of the federal judicial power to only certain kinds of "cases" and "controversies." See U.S. Const. Art. III, Sec. 2, Cl. 1; *Spokeo, Inc.*, 578 U.S. at 338 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). From the "cases" and "controversies" text, the United States Supreme Court has articulated three standing requirements: (1) an injury in fact that is "concrete and particularized" (meaning it affects the plaintiff in "personal and individual way"); (2) a causal connection

15

between the injury and the conduct; and (3) the likelihood that the injury will be redressed with a favorable decision. See, e.g., *Spokeo*, 578 U.S. at 338-339; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (112 SCt 2130, 119 LE2d 351) (1992).

But as a matter of federal law, the "constraints of Article III" do not apply to state courts. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (109 SCt 2037, 104 LE2d 696) (1989). The Georgia Constitution's Judicial Power Paragraph, Ga. Const. of 1983, Art. VI, Sec. I, Par. I, does not contain the same "cases" and "controversies" language found in Article III. See Ga. Const. of 1983, Art. VI, Sec. I, Par. I. And nothing in the Georgia Constitution requires that we follow federal law on standing, even though in our more recent history, this Court has uncritically adopted federal jurisprudence on the question of standing. See, e.g., *Black Voters Matter Fund*, 313 Ga. at 392 (Peterson, J., concurring) (citing cases from recent decades in which this Court announced new Georgia

16

standing rules by "adopting wholesale" federal precedent).[4]

Since federal standing doctrine does not control, we must consider whether the nature of the judicial power that the Georgia Constitution vests in Georgia courts imposes some standing requirement. The Georgia Constitution has only one provision explicitly conferring the state judicial power, and it provides that "[t]he judicial power of the state shall be vested exclusively in" certain classes of courts. See Ga. Const. of 1983, Art. VI, Sec. I, Par. I. The Judicial Power Paragraph has been carried forward without material change from its initial appearance in the 1798 Constitution

---

[4] Given recent cases from this Court in which we have uncritically applied federal standing law (including but not limited to cases cited in *Black Voters Matter Fund*, 313 Ga. at 392) (Peterson, J., concurring)), it is only fair to acknowledge that the Court of Appeals was following our lead in relying on federal precedent in the decision below. This case concerns only whether the Georgia Constitution requires a particularized injury and does not address our precedent on other standing issues in which we have relied on federal jurisprudence (e.g., mootness, redressability, and various federal exceptions to the ordinary federal rules of standing). We trust that this decision will make clear that, in the future, Georgia courts should apply principles of federal standing only to the extent they are (1) following binding precedents of this Court or (2) considering other federal precedent as persuasive authority only "to the extent that [those federal] decisions actually were guided by th[e] same language, history, and context" as that of the relevant state provision. *Elliott v. State*, 305 Ga. 179, 188 (II) (C) (824 SE2d 265) (2019).

17

to the current Constitution of 1983. See Ga. Const. of 1798, Art. III, Sec. I ("The Judicial powers of this State shall be vested in a Superior Court, and in such Inferior Jurisdictions as the Legislature shall from time to time ordain and establish.")[5]; Ga. Const. of 1861, Art. IV., Sec. I., Par. I ("The Judicial powers of this State shall be vested in a Supreme Court for the correction of errors, Superior, Inferior Ordinary and Justices' Courts, and in such other courts as have been or may be established by law."); Ga. Const. of 1865, Art. IV., Sec. I., Par. I (materially same with commas added); Ga. Const. of 1868, Art. V., Sec. I., Par. I ("The Judicial Powers of this State shall be vested in a Supreme Court, Superior Courts, Courts of Ordinary, Justices of the Peace, Commissioned Notaries Public, and such other Courts as have been or may be established by law."); Ga. Const. of 1877, Art. VI, Sec. I., Par. I ("The judicial powers of this State shall be vested in a Supreme Court, Superior Courts, Courts

---

[5] By 1835, with the adoption of several amendments, this section of the 1798 Constitution read: "The judicial powers of this State shall be vested in a Supreme Court for the Correction of Errors, a Superior, Inferior and Justices' Courts, and in such other courts as the legislature shall, from time to time, ordain and establish." See Ga. L. 1811, p. 23; Ga. L. 1835, p. 49.

of Ordinary, Justices of the Peace, commissioned Notaries Public, and such other courts as have been, or may be, established by law"); Ga. Const. of 1945, Art. VI., Sec. I., Par. I (materially same except adding Court of Appeals to list of courts); Ga. Const. of 1976, Art. VI., Sec. I., Par. I (same as 1945); Ga. Const. of 1983, Art. IV., Sec. I., Par. I ("The judicial power of the state shall be vested exclusively in the following classes of courts…").

The presumption of constitutional continuity directs us to begin with the past:

> Because the meaning of a previous provision that has been readopted in a new constitution is generally the most important legal context for the meaning of that new provision, and because we accord each of those previous provisions their own original public meanings, we generally presume that a constitutional provision retained from a previous constitution without material change has retained the original public meaning that provision had at the time it first entered a Georgia Constitution, absent some indication to the contrary.

*Elliott v. State*, 305 Ga. 179, 183 (II) (A) (824 SE2d 265) (2019). And to determine that original public meaning, we consider the "common and customary usages of the words," as informed by their context,

19

including the broader legal backdrop — constitutional, statutory, decisional, and common law — in which the text was adopted. See id. at 187 (II) (B) (citation and punctuation omitted).

Although our search for meaning of constitutional text always begins with the text itself, in this case the text itself sheds little light on what standing limitations might be inherent in the judicial power. The Judicial Power Paragraph does not purport to define what is meant by "[t]he judicial power," and there is no explicit limitation on its scope (unlike its federal counterpart).

To understand the meaning of this text, we must consider the legal background against which the original Judicial Power Paragraph was adopted in the 1798 Constitution, with the common law providing the most critical context. See *State v. Central of Ga. R. Co.*, 109 Ga. 716, 728 (35 SE 37) (1900) ("In construing a constitution, a safe rule is to give its words such significance as they have at common law; especially if there is nothing in the instrument to indicate an intention by its framers that the language in question should have a different construction."); see also *State v. Chulpayev*,

20

296 Ga. 764, 780 (3) (a) (770 SE2d 808) (2015) ("The common law of England as of May 14, 1776, has long been the backstop law of Georgia[.]'"") (citation omitted). A review of the common law suggests that plaintiffs seeking to require local governments to follow the law generally were not required to show an individualized injury.

At common law, courts possessed broad power to adjudicate suits involving private rights — those belonging to an individual as an individual. See 3 William Blackstone, Commentaries on the Laws of England 2 (Robert Bell ed., 1772). Resolving private-rights disputes has been historically recognized as "the core" of judicial power. See, e.g., *Northern Pipeline Const. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50, 70 (102 SCt 2858, 73 LE2d 598) (1982), superseded on other grounds by statute, as stated in *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665, 670-671 (135 SCt 1932, 191 LE2d 911) (2015); 3 Blackstone 2 ("The more effectually to accomplish the redress of private injuries, courts of justice are instituted in every civilized society[.]"); see also *Spokeo*, 578 U.S. at 344 (Thomas, J., concurring) ("Historically, common-law courts

21

possessed broad power to adjudicate suits involving the alleged violation of private rights[.]"). And as we see below in Division (2) (b), a violation of a private right was understood to carry with it some injury sufficient for standing, even if the amount of injury was minimal.

When it came to public wrongs — i.e., violations of public rights and duties that affected the "whole community, considered as a community," 3 Blackstone 2 — common law courts also had authority to adjudicate these public wrongs. Not every person could bring a case to vindicate those public rights, however. Sir William Blackstone, who we have long accepted as the leading authority on the common law,[6] described most of these public wrongs as "crimes and misdemeanors," and stated that the king, who "is supposed by the law to be the person injured by every infraction of the public right belonging to that community," is the "proper prosecutor" to vindicate those public wrongs. See 3 Blackstone 2; 4 Blackstone 2.

---

[6] See, e.g., *Undisclosed LLC v. State*, 302 Ga. 418, 425 (3) (a) & n.8 (807 SE2d 393) (2017).

But not every public wrong was necessarily a crime or misdemeanor. Sometimes the sovereign's subordinate authorities, essentially what we would now call local governments, violated public duties. And the common law recognized several "prerogative" (or extraordinary) writs — e.g., mandamus, injunction, habeas corpus, prohibition[7] — belonging to the king that were "necessary to control subordinate functionaries and authorities," *Jackson v. Calhoun*, 156 Ga. 756, 759 (120 SE 114) (1923), "through Courts of Justice," *Moody v. Fleming*, 4 Ga. 115, 119 (1848). See also *State v. Stevens*, 116 P 605, 607 (Nev. 1911) (noting that prerogative writs originated from the "authority of the king, delegated to his courts, . . . to perfect the administration of his justice, and the control of subordinate functionaries and authorities. By the writ of mandamus he commanded what ought to be done, and by the writ of prohibition he forbade what ought not to be done[.]"). As one scholar explained,

The prerogative writs, in their origin and until the middle

---

[7] The "writs include, inter alia, certiorari, injunction, habeas corpus, mandamus, ne exeat, prohibition, and quo warranto." *Morrow v. District of Columbia*, 417 F2d 728, 733 (D.C. Cir. 1969).

of the nineteenth century, were used primarily to control authorities below the level of the central government. . . . It was, for the most part, the local organs of government which were reached by the writs, but there were included as well all bodies — the colleges, for example — deriving powers from statute, decree, or charter.

Louis L. Jaffe, *Standing to Secure Judicial Review: Public Actions*, 74 Harv. L. Rev. 1265, 1269-1270 (1961).

The exact requirements for pursuing such writs is unnecessary to examine here, but several authorities note that "the English practice was to allow strangers to have standing in the many cases involving the ancient prerogative writs." Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 171 (1992); see also Jaffee, 74 Harv. L. Rev. at 1274-1275. It is not clear what these authorities mean by "strangers," but in context, they appear to be referring to parties who did not suffer any unique, individualized harm. See Sunstein, 91 Mich. L. Rev. at 171-172, 177 ("The relevant [early English and American practices] suggest [that] . . . people have standing if the law has granted them a right to bring suit. There is no authority to

the contrary before the twentieth century[.]"); Jaffee, 74 Harv. L. Rev. at 1274-1275 (the "so-called 'strangers' . . . were technical strangers to the record but otherwise persons with a special interest"). And nothing cited in those authorities suggest that any person not subject to the king's rule could invoke the king's power to control the subordinate functionaries and authorities of the king.

In summary, common law courts had the power (i.e., judicial power) to adjudicate private rights, to adjudicate public wrongs in the nature of crimes, and to issue prerogative writs to control the Crown's subordinates. As we will explain below, our case law is generally consistent with that common law: To invoke the state's judicial power, there must be some injury, but in most local government cases involving public rights, such injury need not be unique to the plaintiff when a member of the relevant community seeks relief.

(b)  *Our case law reflecting the historical understanding of a court's "judicial power" is another contextual clue to the meaning of the Judicial Power Paragraph.*

Despite the absence of an explicit limitation on judicial power

to "cases" and "controversies" in the Georgia Constitution's Judicial Power Paragraph, with the common law serving as our backstop, we have long understood the nature of judicial power itself to contain a similar limitation. The judicial power "is that which declares what law is, and applies it to past transactions and existing cases; . . . [it] expounds and judicially administers [the law]; . . . [it] interprets and enforces [the law] in a case in litigation." *Thompson*, 201 Ga. at 874 (1) (quoting *State v. Dews*, R. M. Charlton Rep. 397, 400 (Ga. Super. Ct. 1835)).[8]

We recognized early in our Court's history that this power is limited to deciding genuine "controversies." See, e.g., *Philadelphia Underwriters v. Folds*, 156 Ga. 773, 776 (120 SE 102) (1923); *Gas-Light Co. of Augusta v. West*, 78 Ga. 318, 319 (1886); see also *Gilbert v. Thomas*, 3 Ga. 575, 579-580 (1847) ("The term 'judicial powers,'

---

[8] This Court was constitutionally authorized in 1835 and then statutorily created by the General Assembly in 1845, and our first opinions were handed down in 1846. But those were not the first reported Georgia opinions. Certain decisions of Georgia's superior courts from as early as 1805 were collected and reported over several decades by Thomas U.P. Charlton, Robert M. Charlton, and George M. Dudley. Until the creation of this Court, there was no appeal above the superior court.

embraces all cases, criminal and civil, at common law and in equity, and the legislature in regulating them, were authorized to make any arrangement of them not repugnant to the constitution."). Although these early cases did not explicitly involve the interpretation of the Judicial Power Paragraph, they are nevertheless instructive of how the scope of judicial power was understood when the Judicial Power Paragraph was carried forward into the 1945, 1976, and 1983 Constitutions. Cf. *Elliott*, 305 Ga. at 182-187 (II) (A) − (B) (a constitutional provision that remains materially unchanged is presumed to carry forward its meaning).

Our recognition that the judicial power is limited to genuine controversies is a consistent theme in our case law. See *Shippen v. Folsom*, 200 Ga. 58, 59 (4) (35 SE2d 915) (1945) (noting that even if the Declaratory Judgment Act did not expressly limit relief to "cases of actual controversy," such a "limitation is generally implied and observed by the courts both in America and in England" (citation and punctuation omitted)).

For an actual controversy to exist, a party must have some

27

right at stake that requires adjudication to protect it. See *Pilgrim v. First Nat. Bank of Rome*, 235 Ga. 172, 174 (219 SE2d 135) (1975) ("It may be stated as a general rule . . . that the parties seeking to maintain the action must have the capacity to sue, and must have a right which is justiciable and subject to a declaration of rights, and it must be brought against an adverse party with an antagonistic interest." (citation and punctuation omitted)); *Braswell v. Equitable Mortgage Co.*, 110 Ga. 30, 33 (35 SE 322) (1900) ("As a general rule, no one can be a party to an action if he has no interest in the cause of action; and in order for a plaintiff in error to succeed in this court, he must show, not only error, but injury. This court is not an expounder of theoretical law, but it administers practical law, and corrects only such errors as have practically wronged the complaining party"); *Brown v. City of Atlanta*, 66 Ga. 71, 76 (1880) (same);[9] see also *Southeastern Greyhound Lines v. Georgia Pub.*

---

[9] This rule applied in the appellate context as well, requiring dismissal of appeals where the plaintiff has no injury that can be redressed by the outcome of a decision. See, e.g., *Cooper Motor Lines, Inc. v. B. C. Truck Lines, Inc.*, 215 Ga. 195, 195 (2) (109 SE2d 689) (1959) (plaintiff's contractual rights

Serv. Commn., 181 Ga. 75, 78-79 (181 SE 834) (1935) ("To adjudicate upon and protect the rights and interests of individual citizens, and to that end to construe and apply the laws, is the peculiar province of the judicial department. (citation and punctuation omitted)"); *Low v. Towns*, 8 Ga. 360, 368 (1850) (the judiciary is the "legitimate and appropriate" branch to adjudicate the "vested rights of individuals, when acquired under the Constitution and laws of the land").

The rule that an actual controversy must exist in order to sue also appears in our considerable body of precedent holding that courts lack the power to issue advisory opinions. See, e.g., *McDowell v. Judges Ex Officio*, 235 Ga. 364, 365 (219 SE2d 713) (1975) ("Not even in a declaratory judgment action is the court permitted to render an advisory opinion."); *Bd. of Commissioners v. Dept. of Public Health*, 229 Ga. 173, 175-176 (2) (190 SE2d 39) (1972) ("In

---

were "in no way" prejudiced by the judgment and, therefore, the plaintiff had no right to bring appeal); *First Nat. Bank of Rome v. Yancey*, 207 Ga. 437, 437 (62 SE2d 179) (1950) ("'It has, we believe, ever been the law, both in this state and in other jurisdictions, that a party not aggrieved by the judgment of a trial court is without legal right to except thereto, since he has of it no just cause of complaint." (citations and punctuation omitted)).

raising those questions on appeal, the appellant seeks to secure the opinion of this court on hypothetical and academic legal questions not involved in this case and not shown yet to have arisen but which appellant fears may arise at some future time, and, in raising these questions, appellant seeks merely an advisory opinion of this court to guide appellant in its future course of conduct. This court is not authorized to render such an opinion."); *Hinson v. First Nat. Bank*, 221 Ga. 408, 410 (1) (144 SE2d 765) (1965) ("This court has many times held that it will not render advisory opinions or pass upon the constitutionality of a statute unless it deprives a party of substantial rights."); *Hand v. Berry*, 170 Ga. 743, 746 (154 SE 239) (1930) ("However much this court might be disposed to decide the abstract question presented, . . . we are without jurisdiction to do so in the present case.").[10]

---

[10] The limitations on the judicial power prevent us from rendering advisory opinions on Georgia law. In contrast, we do have the power to issue advisory opinions regarding the Georgia Rules of Professional Conduct (which govern lawyers) and the Georgia Code of Judicial Conduct (which governs judges). See *In re Judicial Qualifications Commn. Formal Advisory Opinion No. 239*, 300 Ga. 291, 292-297 (1) (794 SE2d 691) (2016); *In re UPL Advisory*

Historically, we recognized that the violation of a private right was sufficient to invoke the judicial power of state courts. Even if the plaintiff alleged only that his or her private rights were violated, the plaintiff had standing to sue, because damages (even if only nominal ones) flowed from the violation of one's rights. See *Hendrick v. Cook*, 4 Ga. 241, 263-264 (4) (1848) (adopting Justice Story's answer to the question of "injury without damage," in which, after considering common law cases, he concluded that "[a]ctual perceptible damage is not indispensable as the foundation of an action. The law tolerates no further inquiry, than whether there has been the *violation of a right*; if so, the party injured is entitled to maintain his action for nominal damages, in *vindication of his right*, if no other damages are fit and proper, to remunerate him"

*Opinion 2003-2*, 277 Ga. 472, 472-473 (588 SE2d 741) (2003). The difference arises from the fact that the Georgia Constitution vests in the General Assembly (with the concurrence of the Governor, or a two-thirds vote to override a veto) the exclusive power to make law, see Ga. Const. of 1983, Art. III, Sec. I, Par. I; id. at Sec. V, Par. XIII; but the Constitution vests in *us* as an incident of the judicial power the exclusive power to regulate the practice of law and to promulgate the Code of Judicial Conduct. Accordingly, advisory opinions interpreting those rules that we have made are a further exercise of the incidental judicial power, not an arrogation of the legislative power.

31

(emphasis in original)). Thus, what has been deemed essential to invoking the judicial power of Georgia courts is not the nature or extent of a plaintiff's damages, but the violation of a right, as adjudicating these rights is what holds a defendant accountable. See *Williams v. Harris*, 207 Ga. 576, 579 (2) (63 SE2d 386) (1951) ("The law infers some damage from the invasion of a property right; and if no evidence is given of any particular amount of loss, it declares the right by awarding what it terms 'nominal damages.'" (citations omitted)); *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 201-202 (50 SE 68) (1905) (A direct invasion of a legal right of the individual "is a tort, and it is not necessary that special damages should have accrued from its violation in order to entitle the aggrieved party to recover."); *Foote & Davies Co. v. Malony*, 115 Ga. 985, 988 (42 SE 413) (1902) ("Nominal damages are not given as compensation for the breach of a contract, but simply in vindication of the right of a person who brings an action upon a good cause, but fails to prove that he has sustained any actual damage, and to prevent his being mulcted in the costs after he has established his

32

cause of action."); *Eiswald v. S. Exp. Co.*, 60 Ga. 496, 498 (1878) (in tort actions, a new trial will be granted where nominal damages were improperly disallowed, because "the mere branding of the defendant's act as a wrong may be of future consequence to the plaintiff in the matter of upholding the right involved").

This consistent approach to the power of courts serves as substantial background against which the Judicial Power Paragraph was readopted into the 1983 Constitution. It also warrants noting that many of these common-law principles were eventually codified. See, e.g, OCGA §§ 9-2-3 ("For every right there shall be a remedy; every court having jurisdiction of the one may, if necessary, frame the other."); 44-12-21 ("For every violation of an express or implied contract and for every injury done by another to one's person or property, the law gives a right to recover and a remedy to enforce it. The right is a chose in action, and the remedy is an action at law.").

As discussed in more detail below, our case law on the violations of public rights by local governments — rights that are

33

shared by the "People in common"[11] — is no different. When a local

government owes a legal duty to its citizens, residents, taxpayers, or

voters (i.e., community stakeholders), the violation of that legal duty

constitutes an injury that our case law has recognized as conferring

standing to those community stakeholders, even if the plaintiff at

issue suffered no individualized injury. One such duty is the general

duty to follow the law. But if the plaintiff is not a community

stakeholder, a local government's duty to follow the law is not owed

to that plaintiff; the plaintiff suffers no cognizable injury as a result

of a violation of that duty; and the uninjured plaintiff cannot bring

suit for that violation.[12]

(c) *Our case law shows that, even for public rights, the plaintiff must show the violation of a right to have a cognizable injury to establish standing.*

As mentioned above, common law courts had the authority to

adjudicate cases involving public rights. The most notable example

---

[11] *Deal v. Coleman*, 294 Ga. 170, 178-181 (2) (a) (751 SE2d 337) (2013) (distinguishing between private and public rights).

[12] As we explain in more detail later, see footnote 18, whether a plaintiff has standing to sue their local government is a separate question from whether the suit is barred by sovereign immunity.

mentioned were criminal prosecutions, but the common law also permitted proceedings to control the actions of the Crown's subordinates that harmed the sovereign. These two types of public rights cases persist in Georgia's legal system, and both types require a legal injury. In particular, criminal statutes are designed to protect person and property, among other things, and the violation of such statutes harms both the victim and the public at large. Because the public is harmed, the State, as the sovereign, is the proper party to prosecute crimes. See *Anthony v. Am. Gen. Financial Servs.*, 287 Ga. 448, 457 (2) (a) (697 SE2d 166) (2010) ("'[C]riminal statutes . . . create rights in favor of the general public, not just individuals damaged by their violation[,]'" and so criminal victims cannot maintain a private cause of action unless statutorily authorized) (quoting *Jastram v. Williams*, 276 Ga. App. 475, 476 (623 SE2d 686) (2005)); *Ambles v. State*, 259 Ga. 406, 406-407 (1) (383 SE2d 555) (1989) ("The [S]tate has both the duty and the right to protect the security of its citizens by prosecuting crime." (citing Georgia Const. of 1983, Art. I, Sec. I, Par. II)). It should go without

saying that the State cannot criminally prosecute someone who has

not violated a criminal statute and thereby injured the public.

For non-criminal cases involving a public right, our case law

requires some injury, even if a plaintiff does not assert a

constitutional challenge to a statute.[13] For these types of public-

rights disputes, the injury can be a generalized one that affects the

public at large and is not unique to the plaintiff. We acknowledge

that we have often been imprecise in describing the characteristics

of a plaintiff who is injured by the violation of a public right

---

[13] We have long held that Georgia courts may not decide the constitutionality of statutes absent an individualized injury to the plaintiff. See, e.g., *Plumb v. Christie*, 103 Ga. 686, 692 (30 SE 759) (1898); *Reid v. Town of Eatonton*, 80 Ga. 755, 757 (6 SE 602) (1888); *Taylor v. Flint*, 35 Ga. 124, 127 (3) (1866); *Scoville v. Calhoun*, 76 Ga. 263, 269 (1886). This standing rule has been applied repeatedly. See, e.g., *Mason v. Home Depot U.S.A., Inc.*, 283 Ga. 271, 273 (1) (658 SE2d 603) (2008); *Lambeth v. State*, 257 Ga. 15, 16 (354 SE2d 144) (1987); *St. John's Melkite Catholic Church v. Commr. of Rev.*, 240 Ga. 733, 735 (3) (242 SE2d 108) (1978); *Northeast Factor & Discount Co. v. Jackson*, 223 Ga. 709, 711 (1) (157 SE2d 731) (1967); *South Ga. Natural Gas Co. v. Ga. Pub. Serv. Commn.*, 214 Ga. 174, 175 (1) (104 SE2d 97) (1958). This kind of individualized injury appears similar to the injury-in-fact required federally. See *Black Voters Matter Fund*, 313 Ga. at 399-400 (Peterson, J., concurring). Because the Plaintiffs are not challenging the constitutionality of a statute, it is not necessary to decide whether this individualized-injury requirement for constitutional challenges to statutes is of a constitutional dimension. And nothing in this opinion should be understood to undermine in any way our longstanding case law articulating this requirement.

sufficiently to bring a claim. We have used the terms "citizen," "resident," "taxpayer," and "voter" — sometimes in isolation, sometimes together, and sometimes interchangeably — as a basis for standing. Although our descriptions have differed from case to case, the underlying principle is that people with a meaningful stake in their community are injured when their local governments violate the legal duty to follow the law.

*(i)  Taxpayer status was the first status to be recognized as conferring standing to sue local governments for generalized grievances.*

With the backdrop of the prerogative writs used to control local government action, early in this Court's history, we entertained the possibility of intervening in government action where there was evidence of fraud or corruption, but declined to do so where those allegations were inadequate. See *Wells v. Mayor & Council of Atlanta*, 43 Ga. 67, 78 (1)-(2) (1871) (after concluding that mayor and council had the authority to enter into the challenged contract, holding that it was improper for a court to interfere into contract where "loose charges of fraud and corruption" were "too vague to

37

justify any serious consideration"). Although *Wells* suggested that judicial intervention could be proper under different circumstances, we did not expressly hold so until 1897, when this Court explicitly held that where a taxpayer alleges that a government officer exceeds his legal authority and that action harms the general public, the taxpayer can bring suit against the government, even though no special injury may accrue to the plaintiff. See *Keen v. City of Waycross*, 101 Ga. 588, 592-594 (3) (29 SE 42) (1897); see also *Koger v. Hunter*, 102 Ga. 76, 79-80 (29 SE 141) (1897) (trial court erred in denying taxpayers' petition to enjoin county commissioners from misappropriating county funds).

In *Keen*, this Court recognized the "prevailing rule" that "any property-holder or municipal taxpayer" had the right — not conferred by statute — to "enjoin municipal corporations and their officers from transcending their lawful powers or violating their legal duties in any mode which will injure the taxpayers[.]" See *Keen*, 101 Ga. at 592-593 (citation and punctuation omitted). *Keen* reasoned that taxpayers of a municipality were in a similar position

38

to and had interests similar in nature to that of private corporation stakeholders (creditors and stockholders) and, therefore, should have the same ability (i.e., standing) as private corporation stakeholders to "attend their own interests," those being to prevent through litigation the illegal acts of municipal authorities, which would otherwise cause loss and expense that taxpayers would ultimately bear. Id. at 593.

This Court then routinely began applying *Keen*'s rule to allow taxpayers to sue both cities and counties for alleged ultra vires actions, even without necessarily alleging an injury to the taxpayer, when it was clear that the ultra vires action would create an illegal debt, cause illegal expenses to be incurred, result in increased taxes, or misappropriate public funds. See, e.g., *Mitchell v. Lasseter*, 114 Ga. 275, 281 (40 SE 287) (1901) ("Any taxpayers of the county had a right to apply to a court of equity to prevent the county commissioners from making contracts which they had no authority to make."); *City of Americus v. Perry*, 114 Ga. 871, 884-885 (6) (40 SE 1004) (1902) (allowing suit to challenge ultra vires actions,

39

"which, if carried into effect, would either result in a misappropriation of public funds or entail upon the taxpayers of the city the expense of litigating with persons who might hold claims against the city under the invalid ordinances"); *Clark v. Cline*, 123 Ga. 856, 864 (51 SE 617) (1905) (taxpayers could sue to enjoin county from making illegal payments to city school system because taxpayer's contribution to public fund constituted a "pecuniary interest" that authorized him prevent "illegal diversion" of public funds); *Fluker v. City of Union Point*, 132 Ga. 568, 570 (64 SE 648) (1909) (noting well-established rule that "taxpayer may enjoin municipal corporations and their officers from making an unauthorized appropriation of the corporate funds or an illegal disposition of the corporate property"); *Dancer v. Shingler*, 147 Ga. 82, 84 (92 SE 935) (1917) (taxpayers can enjoin county board members from executing illegal contract that would expend money of taxpayers or incur indebtedness).

But early on, the plaintiff's status as a taxpayer was insufficient to confer standing where the record did not show a

potential injury to the public treasury or a tax increase. See *Morris v. City Council of Augusta*, 201 Ga. 666, 669-670 (1) (40 SE2d 710) (1946) (distinguishing many cases where this Court had allowed taxpayer suits from cases not allowed because they did not show "that the party suing as a taxpayer was in danger of injury through loss of public funds or property"); *Blanton v. Murray*, 116 Ga. 288, 290 (1) (42 SE 211) (1902) (concluding that taxpayers lacked standing to enjoin public officials from operating dispensary allegedly in violation of town charter because the record showed that the dispensary was being operated at no cost to the town and "without any possibility of the town ever becoming indebted" for its operation); *Mayor & Council of Gainesville v. Simmons*, 96 Ga. 477, 480 (3) (23 SE 508) (1895) (as city taxpayers, plaintiffs could not complain that county's payments to the city for support and maintenance of public schools was illegal, because the funds would benefit, rather than harm, the taxpayers because the funds would reduce, rather than increase, local taxes).

*Keen*'s rule recognized that taxpayers, as community stakeholders, had standing to sue for injuries that affected the public at large, so long as there was some potential injury to the public purse. And this rule has been consistently followed for over a century. See, e.g., *Williams v. DeKalb County*, 308 Ga. 265, 272 (3) (b) (ii) (840 SE2d 423) (2020) (noting that, under Georgia law, the plaintiff's "status as a taxpayer generally affords him standing to seek to enjoin the *unlawful expenditure* of public funds" (emphasis added)); *Lowry v. McDuffie*, 269 Ga. 202, 204 (1) (496 SE2d 727) (1998) (in a suit against the state revenue commissioner and a county tax commissioner, holding that "a taxpayer has standing to contest the legality of the expenditure of public funds of a municipality"); *Savage v. City of Atlanta*, 242 Ga. 671, 671-672 n.1 (251 SE2d 268) (1978) (concluding that the plaintiff, as a taxpayer of the City of Atlanta, had standing to seek injunction to prevent the City's commissioner of finance from paying out public funds under the authority of certain ordinances); *King v. Herron*, 241 Ga. 5, 6 (1) (243 SE2d 36) (1978) ("[A] citizen or taxpayer of a municipality has

standing to question the legality of the expenditure of public funds of the municipality even if such funds are derived solely from license fees, fines, or grants from state or federal sources."); *Barge v. Camp*, 209 Ga. 38, 43 (1) (70 SE2d 360) (1952) ("This court has many times held that citizens and taxpayers of both counties and municipalities have such interest as will authorize them to maintain actions to enjoin the unlawful disposition of public funds or property.").

*(ii)    The plaintiff's status as a citizen or resident can provide a cognizable injury sufficient to establish standing.*

Around the same time *Keen* was decided, however, we also recognized that resident "taxpayers" had standing to sue for generalized grievances that did not directly implicate tax dollars or public property, causing a fair amount of confusion in our case law. In *Board of Commissioners of City of Manchester v. Montgomery*, 170 Ga. 361 (153 SE 34) (1930), "residents and taxpayers" of a city brought suit against city commissioners for mandamus to compel them to perform the duty of selecting a city manager. Id. at 365.

43

While noting mandamus actions required a particularized injury for enforcement of private rights, we concluded that

> where the question is one of public right, and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, it being sufficient that he is interested in having the laws executed, and the duty in question enforced.

Id. at 366. Although the "residents and taxpayers" did not appear to suffer any individualized injury as a result of the failure to select a city manager, this failure violated a duty owed to the public at large, providing the generalized injury to establish the plaintiffs' standing.

The principle recognized in *Montgomery* was soon codified, see Code of 1933, § 64-104,[14] and is now found in OCGA § 9-6-24, which provides:

---

[14] It is important for modern readers to understand the differences between current codification practices and the practices employed in our early codes. Current codification practices are generally limited to incorporating acts of the General Assembly. See OCGA §§ 1-1-1; 1-1-2; 28-9-5. Early codification practices were very different. As exemplified by the Act of the General Assembly providing for what would become the Code of 1863, early codes were generally designed to, "as near as practicable, embrace in a condensed form, the Laws of Georgia, whether derived from the Common Law, the Constitution of the State, the Statutes of the State, the Decisions of the Supreme Court, or the Statutes of England of force in this State[.]" Ga. L. 1858, p. 95. In practice,

Where the question is one of public right and the object is to procure the enforcement of a public duty, no legal or special interest need be shown, but it shall be sufficient that plaintiff is interested in having the laws executed and the duty in question enforced.

Although *Montgomery* was a mandamus case, and OCGA § 9-6-24 is found in a part of the Georgia Code dealing with mandamus, we have applied this general rule more broadly. See *Head v. Browning*, 215 Ga. 263, 266-267 (2) (109 SE2d 798) (1959), abrogation in part on other grounds recognized by *SJN Properties, LLC v. Fulton County Bd. of Assessors*, 296 Ga. 793, 799 (2) (b) (ii) n.6 (770 SE2d 832) (2015); see also *Moore v. Robinson*, 206 Ga. 27, 36-37 (1) (55 SE2d 711) (1949) (applying rule to allow for injunctive relief).

The taxpayer standing rule expressed by *Keen* appears similar to *Montgomery*'s rule now set forth in OCGA § 9-6-24, but it is

---

this meant that many statutes appeared in those codes that had never been individually enacted by the General Assembly; instead, they were legal principles often derived from decisions of this Court. OCGA § 9-6-24 is one of those; indeed, in the 1933 Code where section 64-104 appears, instead of citing an act of the General Assembly that enacted the statute, the Code cited only *Montgomery*.

different.[15] *Keen*'s rule required an injury to the public purse in order to allow a taxpayer suit to proceed, whereas *Montgomery* expressed a relaxed standing requirement to allow citizen/residents suits if the plaintiff "is interested in having the laws executed, and the duty in question enforced." 170 Ga. at 366

Because we have used the term "taxpayer" loosely in many cases, it has not always been clear what, if any, injury we required to establish standing. See *City of East Point v. Weathers*, 218 Ga. 133, 135 (126 SE2d 675) (1962) (noting a line of cases, based on predecessor to OCGA § 9-6-24, that did not require taxpayer to show a special injury to sue, and another line of cases requiring some generalized damage to the taxpayer through creation of illegal debt, misappropriation of public funds, and the like).[16] But *Montgomery*

---

[15] See, e.g., *Williams*, 308 Ga. at 272-274 (3) (b) (i) - (ii) (separately analyzing both taxpayer-injury standing and citizen standing under OCGA § 9-6-24); *Gaddy v. Ga. Dept. of Revenue*, 301 Ga. 552, 555-560 (1) (802 SE2d 225) (2017) (same).

[16] *Weathers* also noted a third line of cases that required a citizen-taxpayer to establish a "peculiar and special interest not shared by the general public" in order to have standing, but the cited cases do not appear to involve allegations that the government actions were ultra vires and instead involved claims more akin to public nuisance actions, which do require such a showing

was really not a taxpayer case in the sense that *Keen* was, because there was no suggestion in *Montgomery* that merely failing to select a city manager would cause any harm to the public purse. Because *Montgomery* was not about tax dollars (which would be a *Keen*-type case), our use of the term "taxpayers" in *Montgomery*, combined with our use of the term "residents," is best understood as capturing the interest that community stakeholders have in ensuring that their local governments follow the law and the cognizable injury to the members of that community when such a government does not.

Following *Montgomery* — and consistently through the adoption of the 1983 Constitution — we have cited its rule, sometimes with hints of applying *Keen*'s rule, as providing the basis for standing for a "taxpayer," even in cases where no tax dollars were directly implicated. See *League of Women Voters v. City of Atlanta,*

---

of a special injury. See *Perkins v. Mayor and Council of Madison*, 175 Ga. 714, 718-719 (165 SE 811) (1932) (citizen-suit to enjoin city defendants from removing shrubs, trees, sidewalks, and fountain from city park and otherwise interfering with use of land by the public as a park); *Alexander v. Citizens and S. Nat. Bank*, 212 Ga. 295, 295 (1) (92 SE2d 16) (1962) (citing only *Perkins* to conclude that citizen-taxpayer lacked standing to sue to enjoin changing a structure on city lot).

245 Ga. 301, 303-304 (1) (264 SE2d 859) (1980) ("We hold that the plaintiffs have standing to bring this suit. In this state, it is established that a citizen and taxpayer of a municipality, without the necessity of showing any special injury, has standing to sue" to challenge city council committee appointments as ultra vires actions by municipal officer); *Stephens v. Moran*, 221 Ga. 4, 4-5 (1) (142 SE2d 845) (1965) (relying on case law applying predecessor statute to conclude that "[t]he plaintiff, as a citizen of such state, county and municipality, is interested in having the laws executed and the duty in question enforced") (citing *Thomas v. Ragsdale*, 188 Ga. 238 (3 SE2d 567) (1939), which cited former code § 64-104 to conclude that citizen had interest in having laws executed); *Head,* 215 Ga. at 265-266 (2) (taxpayers had standing to seek to enjoin State Revenue Commissioner from issuing liquor license to defendant); *Heard v. Pittard*, 210 Ga. 549, 551 (81 SE2d 799) (1954) ("In so far as the allegations of the petition relate to the Sheriff of the City Court of Buford and the citizens and taxpayers residing within the jurisdiction of the City Court of Buford, the allegations are sufficient

to bring the petition within the rule stated in Code, § 64-104[.]");

*Colston v. Hutchinson*, 208 Ga. 559, 561 (67 SE2d 763) (1951); *Screws v. City of Atlanta*, 189 Ga. 839, 842 (1) (8 SE2d 16) (1940) (citizen-taxpayer of Atlanta had sufficient injury to maintain suit to compel city to collect for water furnished to a group for commercial purposes). Because these cases invoked OCGA § 9-6-24 (or its predecessor), the plaintiff's status as a member of the community was dispositive of standing.[17]

---

[17] Sometimes the violation of a duty is enough to provide standing to community stakeholders, but certain statutes may require more for standing. For example, in instances of public nuisances, there is a standing test that has long been engrained into statute and derives from the common law, requiring a plaintiff to allege a "special" or "extraordinary" damage not common to the rest of the public. See OCGA § 41-1-3 (the text, which has not materially changed since it was codified in 1863, provides that "if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action"); see also *Coast Line R. Co. v. Cohen*, 50 Ga. 451, 461 (1873) ("The decisions of the Courts, both in England and America, are quite uniform, that in the case of a purely public nuisance, where no private person receives damage special to himself, the Courts will not interfere, either to enjoin or abate, at the suit of a private individual."). Similarly, to challenge a zoning decision, plaintiffs are required, by statute, to demonstrate a substantial interest that was in danger of suffering a special damage not common to all similarly situated property owners. See *Stuttering Foundation, Inc. v. Glynn County*, 301 Ga. 492, 494 (2) (a) & n.4 (801 SE2d 793) (2017); *Massey v. Butts County*, 281 Ga. 244, 245-248 (637 SE2d 385) (2006).

(iii) *Following adoption of 1983 Constitution, we continued to recognize that community stakeholders, even as "voters," had standing.*

With all of the prior case law regarding citizen-taxpayer standing as the legal backdrop against which the Judicial Power Paragraph was readopted as part of the 1983 Constitution, it is no surprise that we continued to recognize under the current Constitution that taxpayers and citizens have standing to enforce a public duty. See, e.g., *SJN Properties*, 296 Ga. at 799 (2) (b) (ii) ("SJN, as a citizen and taxpayer of Fulton County, clearly has standing to seek" mandamus relief against the county related to the method for treating certain properties as tax exempt); *Arneson v. Bd. of Trustees of Employees' Retirement System of Ga.,* 257 Ga. 579, 579-580 (1)-(3) (361 SE2d 805) (1987) (four taxpayers would have had standing to challenge state entity's disposition of retirement benefits if the questioned acts were ultra vires), abrogated on other grounds recognized by *SJN Properties*, 296 Ga. at 799 (2) (b) (ii) n.6.

And it is unsurprising that we have extended this logic to "voters," because they, like citizens and taxpayers, are community

stakeholders. Voters may be injured when elections are not administered according to the law or when elected officials fail to follow the voters' referendum for increased taxes to fund a particular project, so voters may have standing to vindicate public rights. See, e.g., *Barrow v. Raffensperger*, 308 Ga. 660, 667 (2) (b) (842 SE2d 884) (2020) (plaintiff's claim that cancellation of election violated the law was a sufficient injury to a voter, even without an injury that was "special" to her, for voter to have standing to bring mandamus claim to compel election); *Rothschild v. Columbus Consol. Govt.*, 285 Ga. 477, 479-480 (678 SE2d 76) (2009) (plaintiffs' allegations that defendants failed to perform public duty promised to voters was sufficient to establish standing); *Manning v. Upshaw*, 204 Ga. 324, 326 (49 SE2d 874) (1948) (plaintiff, as a "citizen and a voter" of Alpharetta, may maintain a petition for mandamus to compel the mayor and city council members to call for an election to elect their successors).

Although the terms "citizens" and "residents" are perhaps more precise (or less confusing) in cases involving a public duty, these

51

types of cases reflect that community stakeholders — citizens, residents, voters, and taxpayers — are injured when their local governments do not follow the law.[18] Where a public duty is at stake, a plaintiff's membership in the community provides the necessary standing to bring a cause of action to ensure a local government follows the law.[19] See *Arneson,* 257 Ga. at 580 (2) (c) ("Public responsibility demands public scrutiny.").

---

[18] Whether a plaintiff has standing to sue and whether sovereign immunity bars a suit are separate questions. As we have previously recognized, some of these and similar cases no longer remain good law to the extent that sovereign immunity bars such suits, but these cases remain good law to the extent they "simply confirmed a taxpayer's *standing* to seek to enforce a public duty by way of some viable cause of action." *SJN Properties*, 296 Ga. at 799 (2) (b) (ii) n.6 (emphasis in original); see also *Williams*, 308 Ga. at 273 (3) (b) (ii) n.13; *Layer v. Barrow County*, 297 Ga. 871, 871 (1) (778 SE2d 156) (2015) (sovereign immunity applies to suits against county officers sued in their official capacities). We should also note that each of these sovereign immunity cases were decided before the adoption of the new sovereign-immunity waiver provision allowing for actions seeking declaratory relief. See Ga. Const. of 1983, Art. I, Sec. II, Par. V (b).

[19] These cases arise in the context of suits against local governments involving a public duty. Both our reasoning and our holding regarding standing is limited to suits against local governments. In other words, we merely hold that a cognizable injury, even a generalized one, is constitutionally required and that a community stakeholder suffers such an injury when their local government fails to follow the law. Whether the same principle would hold true for suits against state government entities raises separation of powers questions beyond the scope of our decision today, given that the Georgia Constitution's Separation of Powers Provision does not apply to local governments. See Ga. Const. of 1983, Art. V, Sec. II, Par. II ("The Governor

To recap from our discussion above, from the earliest days of this Court we have understood the power of courts — the judicial power — to be limited to cases involving actual controversies, which requires a showing of some injury. Our case law has been essentially consistent in reflecting this understanding, all of which informs the meaning of the Judicial Power Paragraph when it was readopted in the 1983 Constitution. Because the Judicial Power Paragraph vests the "judicial power" in state courts, and the nature of judicial power has long been understood as limited to resolving those controversies in which there is a cognizable injury, the requirement that plaintiffs

---

shall take care that the laws are faithfully executed and shall be the conservator of the peace throughout the state."); *Ward v. City of Cairo*, 276 Ga. 391, 392-393 (1) (583 SE2d 821) (2003) (Separation of Powers Clause of Georgia Constitution does not apply to municipal offices); *Building Authority of Fulton County v. State*, 253 Ga. 242, 247 (5) (321 SE2d 97) (1984) (Separation of Powers Clause applies only to the State, not to cities or counties); *Ford v. Mayor & Council of Brunswick*, 134 Ga. 820, 821 (68 SE 733) (1910) (same as *Ward*); cf. *Sierra v. City of Hallandale Beach*, 996 F3d 1110, 1119 (11th Cir. 2021) (Newsom, J., concurring) (citing *Lujan* to argue that permitting legislature to allow cause of action that would allow judicial oversight into executive branch's constitutional duty to "execute" the laws would violate separation of powers).

Moreover, because this case is only about suits against local governments, we decide nothing today about the legislature's authority to create an individualized injury-free cause of action against private parties.

53

have a cognizable injury in order to invoke the power of the courts is a standing requirement arising from the Georgia Constitution's Judicial Power Paragraph. The Plaintiffs do not argue — much less support such an argument with authority — that standing can be established in the absence of a cognizable injury. We are aware of no line of authority supporting the idea that Georgia courts have the authority to resolve a dispute where no rights are violated or injury suffered. And indeed, obviating the cognizable-injury requirement would run afoul of the strict prohibition against issuing advisory opinions. Deciding questions in which a plaintiff has suffered no injury and where no rights can be vindicated by a judicial decision is tantamount to "making law," rather than interpreting and applying it to an accrued set of facts. Such actions would encroach upon the powers reserved for the other co-equal branches of government.

Because we understand this injury requirement as being of constitutional dimension, the General Assembly lacks the authority to set it aside by statute. The General Assembly could, of course,

with the ratification by Georgia citizens, amend the constitution to provide standing where the plaintiff has not been injured at all, even in a generalized way not unique to the plaintiff. See *Elliott*, 305 Ga. at 225 (Boggs, J., concurring) (explaining that, if the General Assembly and the people are unhappy with the meaning of a constitutional provision, they are free to amend the constitution). But no such amendment has been adopted.

With these principles established, we turn to the question of whether the Plaintiffs have, in this procedural posture, established such an injury. At the motion to dismiss stage, we accept as true all well-pled material allegations in the complaint. See *Williams*, 308 Ga. at 270 (2).

(d) *Only Humphries, as a citizen of her local community, has standing here.*

Since they are not challenging the constitutionality of a statute, the Plaintiffs do not need to have alleged an individualized injury. Compare *Mason*, 283 Ga. at 273 (1). But they still need to have alleged a cognizable injury.

55

The Plaintiffs argue that OCGA § 50-3-1 (b) (5), by itself, provides them standing to sue because it allows "any person, group, or legal entity" the right to bring a cause of action. Admittedly, our case law has sometimes been unclear about whether statutory language creating a cause of action determines a party's standing. See, e.g., *RES-GA McDonough, LLC v. Taylor English Duma LLP*, 302 Ga. 444, 448 (1) (807 SE2d 381) (2017) (concluding that plaintiff "had no standing to pursue a fraudulent transfer claim" based on the statutory language governing the cause of action); *GeorgiaCarry.org, Inc. v. Allen*, 299 Ga. 716, 717-720 (791 SE2d 800) (2016) (using "standing" to describe proper party authorized to bring cause of action when, after concluding that nonprofit corporation was not a "person" qualified to bring cause of action that was limited to natural persons, analyzing whether that corporation nonetheless had associational standing to pursue a writ on behalf of its members); *Carringer v. Rodgers*, 276 Ga. 359, 360, 362-365 (578 SE 2d 841) (2003) (construing statutes to determine that parent of a decedent child who was murdered by his surviving spouse had

56

"standing" to bring a cause of action for the wrongful death of the child against the murdering spouse and/or another individual or entity proximately causing the child's death). Some cases have recognized a distinction between the cognizable injury necessary to invoke the judicial power and the right to bring a cause of action. See *Atlanta Americana Motor Hotel Corp. v. Undercofler*, 222 Ga. 295, 298 (1) (149 SE2d 691) (1966) ("Obviously, this count states no cause of action unless the constitutional attack is sustained, and as we view the allegations, the plaintiff has no standing to make a constitutional attack because it alleges no injury to itself from the application of the statute it seeks to challenge."); *Stillwell v. Topa Ins. Co.*, 363 Ga. App. 126, 128-131 (1) (871 SE2d 8) (2022) (distinguishing clearly between constitutional standing and scope of a statutory cause of action) (citing cases); *Oldham v. Landrum*, 363 Ga. App. 284, 292-293 (2) (a) (870 SE2d 82) (2022) (Pinson, J., concurring in part and dissenting in part) (making same distinction and noting that whether a plaintiff is within the class of people that the statute authorizes to bring a cause of action is sometimes called

57

"statutory standing").

Although those cases discussing standing in terms of statutory causes of action may have conflated the idea of cognizable injury with whether a party is authorized by the relevant statute to bring a causes of action (or "statutory standing"),[20] our above discussion makes clear that a statute cannot confer standing in the absence of a cognizable injury.[21] OCGA § 50-3-1 (b) (5)'s language allowing "any person, group, or legal entity" the right to bring a cause of action does not state whether that "person, group, or legal entity" must suffer some cognizable injury. Reading the absence of such language as permitting a plaintiff to bring a cause of action under OCGA § 50-3-1 (b) (5) without such an injury would create serious questions about the constitutionality of the statute, so we must read the

---

[20] Those cases do not control and we need not reconsider them because the constitutional question before us now was not raised in those cases. See *Wolfe v. Bd. of Regents of Univ. Sys. of Ga.*, 300 Ga. 223, 231 (2) (d) (794 SE2d 85) (2016) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (citation and punctuation omitted)).

[21] Of course, a statute can create a legal duty, the violation of which can be a cognizable injury, but the duty must be owed the plaintiff. The creation of a duty generally does not, alone, create the cognizable injury.

statute consistent with the constitutional standing requirements set out above. See *Premier Health Care Invs., LLC v. UHS of Anchor, L.P.*, 310 Ga. 32, 48 (849 SE2d 441) (2020) ("Under the canon of constitutional doubt, if a statute is susceptible of more than one meaning, one of which is constitutional and the other not, we interpret the statute as being consistent with the Constitution." (citation and punctuation omitted)). That being said, the Plaintiffs cannot rely solely on the right to bring a cause of action under OCGA § 50-3-1 (b) (5) as establishing their cognizable injury.

As for their cognizable injury, the Plaintiffs allege that their "rights and dignity" will be injured as a result of the monument removals. The Plaintiffs cite no authority supporting the proposition that this sort of injury to dignity, without more, is a cognizable injury. The Plaintiffs do not specify what rights were allegedly violated. To the extent they rely on OCGA § 50-3-1, that statute created a public duty on the part of government entities to protect and preserve public monuments and provided a cause of action for a violation of that duty. Because that statute creates a public duty,

the Plaintiffs would have standing if, at a minimum, they alleged some community stakeholder status that would give them a cognizable injury for their local government's alleged failure to follow the law. Only Humphries has done so.

(i)     *Humphries has standing to pursue injunctive relief.*

By alleging that she is a citizen of Newton County, Humphries has alleged a cognizable injury as a result of Newton County's vote to move a public monument from display, in violation of OCGA § 50-3-1. This injury is sufficient to support her claims for injunctive relief under our public rights cases discussed above.[22]

But Humphries also asserts a claim for damages. All of the public-rights cases discussed above, and others of which we are aware, concerned various forms of equitable relief, not claims for money damages. It is not clear that the logic of those public rights cases, which center on protecting the rights of the community rather than on one specific individual, can be extended to permit one

_____

[22] The question of whether this claim is barred by sovereign immunity is beyond the scope of our review, and we leave it to the Court of Appeals to decide the question in the first instance.

individual to recover damages, but that is not a question we need definitely resolve today. To decide that question would be to decide whether the General Assembly has constitutional authority to permit damages in a statute like OCGA § 50-3-1 to be sought by a party with only public-rights standing. And as a matter of constitutional avoidance, we must not address a constitutional question where it is unnecessary to do so. See *Deal*, 294 Ga. at 171 n.7 (noting that it is well-settled that this Court will not decide a constitutional question if the decision in the appeal can be made upon other grounds). And here it is not necessary.

We need not resolve whether the General Assembly lacked such constitutional authority, and thus determine the constitutionality of OCGA § 50-3-1, because the cause of action that the statute purports to create has not yet arisen under Humphries's allegations. The statute prohibits the relocation, removal, concealment, or alteration of a monument, and makes liable any conduct that damages, destroys, loses a monument or removes one without replacement. See OCGA § 50-3-1 (b) (3), (4). By Humphries's

own admission, none of this conduct has occurred — the County has merely voted to remove a monument, but it has not yet done so. Because damages are authorized only for conduct prohibited by the statute, and the statute does not prohibit a vote to remove a monument in the future, Humphries cannot seek damages here. Accordingly, the Court of Appeals erred in affirming the dismissal of her claim for injunctive relief but was correct to dismiss her claim for damages, albeit for a different reason.[23]

(ii) *The Sons of Confederate Veterans groups lack standing*.

The various Sons of Confederate Veterans groups did not allege that they are citizens, residents, or taxpayers of any county, much

---

[23] We can easily dispose of the Newton County Board of Commissioners' argument that allowing *any* resident, citizen, or taxpayer to sue would allow *every* such person and entity to sue and that the multitude of resulting lawsuits would cause significant harm to the county's finances. Because the underlying interest concerns a public right, as opposed to a private one, the outcome of a suit against a local government under OCGA § 50-3-1 may well bind nonparties who share that interest. See *Lilly v. Heard*, 295 Ga. 399, 405 (761 SE2d 46) (2014) (noting in case brought under voter standing, "although the general rule is that a judgment binds only the parties to the case, we conclude that this case falls within the exception to that rule for nonparties who are adequately represented by a party with the same interest." (citation and punctuation omitted)).

less the counties that they sued. They have set forth no allegations showing that they are community stakeholders, such that the duty created by OCGA § 50-3-1 is one that is owed to them. Therefore, any violation of OCGA § 50-3-1 does not result in a cognizable injury to the Sons of Confederate Veterans groups; and, as a result, they do not have independent, direct standing as organizations. See *Black Voters Matter Fund*, 313 Ga. at 382 (1) (a) ("[O]rganizational standing permits an organization to sue in its own right if it meets the same standing test applicable to individuals.").

In addition to not having standing in their own right, the Sons of Confederate Veterans groups do not have associational standing. See id. ("Organizational standing, as opposed to associational standing, does not depend on the standing of an organization's members[.]"); see also *Sawnee Elec. Membership Corp. v. Ga. Dept. of Revenue*, 279 Ga. 22, 24 (3) (608 SE2d 611) (2005) ("Associational standing permits an association that has suffered no injury to sue on behalf of its members when the members would otherwise have standing to sue in their own right; the interests the association seeks

to protect are germane to the association's purpose; and neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members.").[24] The Sons of Confederate Veterans groups did not allege that they had associational standing or otherwise indicate that they include members that would have citizen/resident/taxpayer standing on their own.

To the extent the Sons of Confederate Veterans groups argue that OCGA § 50-3-1's authorization of damages provides them with an injury, their view of standing is backwards. The statutory award of damages (treble cost of repair, attorney's fees, and possible exemplary damages) is authorized when there is an injury, but it does not create the injury itself. An injury arises when the public duty imposed by the statute is violated. But our case law makes

---

[24] In *Aldridge v. Ga. Hosp. & Travel Assn.*, 251 Ga. 234 (304 SE2d 708) (1983), we adopted the federal test on associational standing after noting that there was no Georgia case law on the issue and without examining critically whether there was good reason to adopt that federal precedent. See id. at 235-236 (1). Although we have made clear in this opinion that federal standing law does not control the question of standing under state law, whether associational standing is independently viable under Georgia law is not an issue any party has raised. Regardless, the Sons of Confederate Veterans groups make no claim that the resulting analysis would be different under a state law conception of associational standing, if such a thing existed.

clear that that this public duty is owed to community stakeholders. A violation of that duty does not injure people to whom the local government owes no duty.

We reiterate that when a local government owes a legal duty to community stakeholders, the violation of that legal duty constitutes an injury that our case law has recognized as conferring standing to those stakeholders, even if the plaintiff at issue suffered no individualized injury. Because the Sons of Confederate Veterans groups have not alleged anything resembling community stakeholder status and have alleged no other cognizable injury, they do not have standing, and the Court of Appeals was right to affirm the dismissal of their complaints.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Ellington and Colvin, JJ., disqualified.*